**UNITED STATES of America**

v.

**Wolodymir OSIDACH a/k/a Wolodymir Osidacz.**

**Civ. A. No. 79–4212.**

United States District Court, E. D. Pennsylvania.

March 17, 1981.

As Amended March 30, 1981.

---

Neal Sher, Deputy Director, Rodney G. Smith, Atty., Norman Moscowitz, Atty., Office of Special Investigations, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Louis S. Konowal, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

BECHTLE, District Judge.

## TABLE OF CONTENTS

GENERAL—statement of the case ................................ pp. —————
I. FACTUAL BACKGROUND ............................... pp. —————
 (A) Events Prior to 1939 .................................... pp. —————
 (B) Events From 1939 to 1941 ................................ pp. —————
 (C) Events From 1941 to 1944 ................................ pp. —————
 (D) The Rawa Ruska Ghetto .................................. pp. —————
 (E) Defendant Osidach's Undisputed Activities From 1941 to 1944 .. pp. —————

**56**

## TABLE OF CONTENTS

II. ILLEGAL PROCUREMENT ............................... pp. ——–——

 (A) Unlawful Admission into the United States ................. pp. ——–——

 (1) Ineligibility as a Displaced Person ..................... pp. ——–——

 (a) Historical Overview ............................ pp. ——–——

 (b) Application of the Fedorenko Decision to § 13 of the DPA ...................................... pp. ——–——

 (c) Membership Under § 13 of the DPA ................ pp. ——–——

 (d) Constitutional Limitation ........................ pp. ——–——

 (2) Osidach's Ineligibility as a Displaced Person ............. pp. ——–——

 (a) Role of the Ukrainian Police Throughout Galacia from 1941 to 1945 ..................................... pp. ——–——

 (b) Role of the Ukrainian Police in the Town of Rawa Ruska from 1942 to 1944 ......................... pp. ——–——

 (i) Documentary Proof .......................... pp. ——–——

 (ii) Eyewitness Testimony ........................ pp. ——–——

 (ii–a) Enforcement of Ghettoization of Jews and Enforcement of Other Degrading Laws Enacted for the Jewish Population by the Occupying Germans ...................... pp. ——–——

 (ii–b) Guarding and Abuse of Jewish Laborers ..... pp. ——–——

 (ii–c) Ukrainian Police Used in the Deportation of Jews from the Ghetto .................. pp. ——–——

 (ii–d) Activities of the Ukrainian Police in the Final Action Involving the Liquidation of the Rawa Ruska Ghetto ................ pp. ——–——

 (c) Osidach's Version of the Role of the Ukrainian Police in the Town of Rawa Ruska from 1942 to 1944 .......... pp. ——–——

 (i) Administrative Necessity ...................... pp. ——–——

 (ii) The Jewish Order Police ...................... pp. ——–——

 (iii) Defendant Osidach's Role as a Willing Member of the Ukrainian Police in the Town of Rawa Ruska from 1942 to 1944 ........................... pp. ——–——

 (iv) Osidach as a Participant Under § 13 ............. pp. ——–——

 (B) Misrepresentation of a Material Fact Under § 10 of the DPA ... pp. ——–——

III. CONCEALMENT OR MISREPRESENTATION OF A MATERIAL FACT IN SECURING CITIZENSHIP ....................... pp. ——–——

IV. CONCLUSION .......................................... pp. ——–——

APPENDIX ................................................ pp. ——–——

ORDER

Presently before the Court is a denaturalization action filed by the United States as plaintiff, pursuant to section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a): to revoke and set aside the district court's order admitting defendant Wolodymir Osidach ("Osidach") as a United States citizen; and, to cancel his certificate of naturalization (number 8633492) which was issued pursuant to that order. Jurisdiction is conferred upon this Court under 28 U.S.C. § 1345, and 8 U.S.C. §§ 1421(a), 1451(a).

The Government stands on two major theories, each with several minor subcomponents, upon which it bases its case seeking the denaturalization of Osidach. Both theories are founded upon § 1451(a) of the Immigration and Nationality Act, as amended, 8 U.S.C. § 1451(a) ("INA"), which provides:

 (a) It shall be the duty of the United States attorneys for the respective dis-

tricts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: *Provided*, That refusal on the part of a naturalized citizen within a period of ten years following his naturalization to testify as a witness in any proceeding before a congressional committee concerning his subversive activities, in a case where such person has been convicted of contempt for such refusal, shall be held to constitute a ground for revocation of such person's naturalization under this subsection as having been procured by concealment of a material fact or by willful misrepresentation. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence.

■ The two major theories advanced by the Government are: (1) Osidach illegally procured his citizenship; and/or, (2) Osidach willfully misrepresented and/or concealed certain material facts from the immigration authorities at the time he procured his grant of citizenship. The Government contends that it should prevail under either or both theories. It must be kept in mind that, despite the content of the allegations and counter-allegations, this case is not a criminal case but a civil case; accord-

ingly, these theories are necessarily dependent upon common elements of fact which must be proven by the Government by what the United States Supreme Court has recently described as "clear, unequivocal and convincing evidence" which "does not leave the issue in doubt." *Fedorenko v. United States,* —— U.S. ——, ——, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981), *quoting Schneiderman v. United States,* 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796 (1943). *See also Woodby v. Immigration Service,* 385 U.S. 276, 285–286, 87 S.Ct. 483, 487–488, 17 L.Ed.2d 362 (1966). As the Court in *Fedorenko* stated:

> On the one hand, our decisions have recognized that the right to acquire American citizenship is a precious one, and that once citizenship has been acquired, its loss can have severe and unsettling consequences. See *Costello v. United States,* 365 U.S. 265, 269 [81 S.Ct. 534, 536, 5 L.Ed.2d 551] (1961); *Chaunt v. United States, supra,* [364 U.S. 350] at 353 [81 S.Ct. 147, 149, 5 L.Ed.2d 120]; *Baumgartner v. United States,* 322 U.S. 665, 675–676 [64 S.Ct. 1240, 1245–1246, 88 L.Ed. 1525] (1944); *Schneiderman v. United States,* 320 U.S. 118, 122 [63 S.Ct. 1333, 1335, 87 L.Ed. 1796] (1943).

> \* \* \* \* \* \*

> Any less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding. And in reviewing denaturalization cases, we have carefully examined the record ourselves. See, *e. g., Costello v. United States, supra; Chaunt v. United States, supra; Nowak v. United States,* 356 U.S. 660 [78 S.Ct. 955, 2 L.Ed.2d 1048] (1958); *Baumgartner v. United States, supra.*

—— U.S. at ——, 101 S.Ct. at 747.

This case raises a myriad of complex and difficult factual and legal issues based upon a series of events spanning nearly 50 years. The following constitutes the procedural chronology around which this decision will flow. In May, 1949, the defendant filed a resettlement and registration form with the

International Refugee Organization ("IRO") in order to be certified as a "displaced person of concern to the IRO" under the IRO Constitution [Ex. P–17]. After being so certified, Osidach then applied to the United States Displaced Persons Commission ("DPC") in June of 1949 for classification as a displaced person, as defined under the Displaced Persons Act of 1948, P.L. No. 80–774, 62 Stat. 1009 ("DPA"). After Osidach's application, the DPC issued its report [Ex. P–20]. The next step in the procedure was for Osidach to apply to the American Consulate—which he did in Munich, Germany, on July 6, 1949—seeking an immigration visa to the United States as a displaced person. That entry visa was granted by a vice consul of the American Consulate [Ex. P–21]. Finally, on the authority of that immigration visa, Osidach entered the United States with his family at New York City on July 29, 1949. After residing in this country for some 14 years, he submitted an application, on April 23, 1963, seeking permission to file a petition for naturalization as a United States citizen with the Immigration and Naturalization Service ("INS") at Philadelphia [Ex. P–23]. This was followed on June 10, 1963, by the filing of the petition itself [Ex. P–24]. Eventually, on August 7, 1963, the United States District Court for the Eastern District of Pennsylvania granted Osidach's petition for naturalization and upon issuance to him of a certificate of naturalization, Wolodymir Osidach became a citizen of the United States of America [Ex. P–25].

■ For over 16 years, Osidach enjoyed the full rights and fulfilled the obligations and responsibilities of a citizen of the United States. On November 20, 1979, the present action for denaturalization was filed against Osidach by the United States with an accompanying affidavit stating good cause as required by law, 8 U.S.C. § 1451(a). On September 15, 1980, after the resolution of a variety of expected and understandable disputes concerning pretrial matters, the non-jury trial [1] for denaturalization commenced. The trial lasted 13 days, with the Court hearing the testimony of 14 in-court witnesses (including the defendant), viewing the videotape depositions of 7 witnesses, reading the depositions of 5 additional witnesses and receiving into evidence over 50 exhibits from both parties. On November 14, 1980, proposed findings of fact and conclusions of law were filed by the parties and final argument was heard by the Court on November 17, 1980.

The factual allegations raised by the Government, upon which their legal theories are buttressed, concern Osidach's pre-World War II and war-time conduct—including his organizational, political, criminal and employment activities between 1930 and 1944.

Therefore, from this juncture, the Court's Opinion will be divided into the following areas: (1) a discussion of the undisputed facts surrounding this litigation, including a general historical overview of international activities from 1917 until 1944 and, in particular, Osidach's activities between 1930 and 1944; and, (2) a discussion of the two major theories relied on by the Government to support its claim. This discussion will include findings of fact as to disputed factual issues and an application of those facts to the Government's theories, which will form the Court's conclusions of law.

## I. FACTUAL BACKGROUND [2]

### (A) Events Prior to 1939

In 1917, a portion of eastern Europe—known then as the Ukraine—declared its

---

1. Denaturalization actions, as civil actions in equity, do not warrant a trial by jury under the Seventh Amendment. *U. S. v. Luria*, 231 U.S. 9, 27–28, 34 S.Ct. 10, 15, 58 L.Ed. 101 (1913). *See also U. S. v. Matles*, 247 F.2d 378, 381 (2d Cir. 1957).

2. The Court declares at the outset that any findings or discussions of historical events contained herein are in no way to be construed as an opinionated commentary upon the many political, ethnic and religious issues underlying this action. Those issues are better left for resolution, if possible, in alternative forums. In that regard, the Court finds the rationale articulated by the United States Supreme Court particularly applicable:

independence [N.T. 10–18]. That independence was short-lived for, after three years of struggle, the Ukrainians were defeated by the Russians and the Poles. At that time, the Ukraine was divided—with the western portion of the Ukraine becoming Polish controlled and the eastern and central areas coming under Soviet domination [N.T. 10–18 to 19]. This latter area is now known as the Ukrainian Socialist Party Republic.

During this period of divided Polish and Soviet control prior to 1930, when considerable efforts were being made by both countries to assimilate the Ukrainian people into the respective Polish and Soviet lifestyles, an underground movement emerged that was composed of persons who advocated a return to an independent Ukraine free from either Polish or Soviet control. One of those nationalist groups was called the Organization of Ukrainian Nationalists ("OUN"), which was founded in 1929 [N.T. 10–19]. This group was involved in numerous political activities advocating a return to a free Ukraine. Those activities took the form of new members and other protest functions. Because the OUN was regarded by both the Polish and Soviet governments as subversive and hostile, its members were often harassed, arrested, imprisoned and generally and routinely persecuted for their membership in that group [N.T. 10–24; 2–127 to 130, 152; *see also* Ex. P–15]. During the 1930's, the entire area comprising the Ukraine was subject to a severe famine. There was also great political and economic turmoil which resulted in numerous political arrests [N.T. 10–19 to 21].

From 1930 to 1939, Osidach freely admits that, while living in the town of Rawa Ruska in the Polish Ukraine, he was a member of the OUN and was on at least five occasions arrested and imprisoned for varying periods for advocating a free Ukraine [N.T. 2–150 to 156]. The political activities which led to his arrests during this period included distributing and posting handbills, possessing written materials and recruiting members for the OUN. In some of these arrests by the Polish government, he was released after a few days of detention; while on other occasions he was eventually tried by a Polish court of law and sentenced to varying brief prison terms. Overall, Osidach served a total of six years in "political prisons" for his beliefs [N.T. 2–154; 10–24]. The longest continuous period he spent in prison was eighteen months [N.T. 2–154]. These arrests and convictions were well-documented by the Government at trial and were authenticated by an expert in Polish law [Ex. P–10 to 16; N.T. 2–80 to 123].

(B) *Events From 1939 to 1941*

In 1939, Nazi Germany[3] and the Soviet Union—in an unusual exercise of international friendship—agreed that, as a seal of their friendship, they would partition what was then Poland, with the Soviet Union occupying the western portion. This partition resulted in the Ukraine also being split between German and Soviet control. The town and region of Rawa Ruska, located in the western Ukraine, became subject to Soviet control. The friendship between these two powers was predictably short-lived and on June 21, 1941, the Germans manifested their change-of-heart by undertaking a full-scale military invasion of the Soviet portion of Poland, as well as the Soviet Union itself, thus engulfing the Ukraine as well as all of Poland.

During this period and before the Nazi invasion, Osidach was released from prison,

We agree with our brethren of the minority that our relations with Russia, as well as our views regarding its government and the merits of Communism are immaterial to a decision of this case. Our concern is with what Congress meant by certain statutes and whether the Government has proved its case under them.
*Schneiderman, supra,* 320 U.S. at 119–120, 63 S.Ct. at 1334.

**3.** Any and all reference throughout this Opinion concerning "Germany" or "Germans" (and their activities) during the period of time the Nazi Party had political control of Germany are intended to specifically encompass persons who were in fact members of the Nazi Party and the activities they engaged in.

whereupon he took up residence and worked from approximately September of 1939 until June of 1941 in Tomaszow, Poland, which was the portion under German control [N.T. 2–158 to 160].

### (C) *Events From 1941 to 1944*

As the Germans assumed control over Poland, they organized it into five major regions, each presided over by a German-controlled civil government. One of those regions was known as "Galicia," which included within it the lesser region of Rawa Ruska, which, in turn, included the *town* of Rawa Ruska. In 1941, the population of the town of Rawa Ruska was approximately 10,000 to 11,000 persons. Approximately one-half of the people were Jews, while the remaining inhabitants were divided fairly equally between Ukrainians and Poles [N.T. 1–98; 3–50].

Soon after the military conquest of eastern Europe, the German high-command began to implement its uniform policy providing for the systematic, calculated extermination of the Jewish population in the occupied areas. As the German Wehrmacht military forces swept through the conquered areas, they were followed by mobile killing units composed of "S.S." (Shutzstaffel) and other security personnel (called Einsatzgruppen), who proceeded to butcher innocent members of the Jewish civil population, including women and children, of all ages, through sundry methods of mass killing. Those Jews who survived, by whatever circumstance, were scheduled by the German high-command to nevertheless become victims of a somewhat different but more systematic and, for that reason, more efficient method of mass annihilation [N.T. 1–89 to 93; Ex. P–1 at 177 *et al.*]. This was by means of "killing centers" scattered throughout eastern Europe, including the Ukraine. It was at these centers, equipped with gas chambers for large-scale destruction, that millions of Jews, as well as members of other groups which the Germans deemed undesirable or hostile toward the war effort, were murdered [N.T. 1–101].

The gas chambers were the final step of a diabolical scenario called by the Germans the "final solution" of the "Jewish problem" or "PLAGUE" so that specified areas would be "free from Jews" [Ex. P–2]. Throughout eastern Poland and the Ukraine, the Germans implemented this policy by the forcible uprooting and removal of Jews from the outlying towns and villages and transporting them into the larger towns within the regions [N.T. 1–89 to 92; Ex. P–1 at Chapter VI]. Within these towns, central concentration locations or "ghettos" were established where these persecuted people, from the towns and the surrounding areas, were collected and forced to live—to await further disposition. The ghettos were established in towns near main railroad lines and centers, so that the Germans could easily and conveniently—beginning in 1942, after the collecting process had been completed—transport the residents of the ghettos by train to the killing centers located throughout the regions. The German scheme also included the confiscation of Jewish-owned property [N.T. 1–101 to 102] and, in the interim between subjugation and extermination, the utilization of Jews as forced laborers at various German-created worksites [N.T. 1–89 to 92, 101 to 102].

### (D) *The Rawa Ruska Ghetto*

The town of Rawa Ruska was located in the minor region of Rawa Ruska, which was itself included within the major region of Galacia in the western Ukraine. It was located at the intersection of major railroad lines [N.T. 1–102; M.M. Bankh dep. at 42]. Because of its location along railroad lines and its close proximity to the killing center at Belzec, approximately 20 miles northwest of the town, a Jewish ghetto was established by the Germans soon after their occupation of the town in 1941 [N.T. 4–110]. The ghetto was located in the center of the town a few blocks from the town square and the Jewish house of worship (synagogue). This ghetto area was sealed off from the remainder of the town [N.T. 4–110]. The Jewish population in the areas on the outskirts of Rawa Ruska were forcibly delivered into the ghetto [N.T. 1–102; 6–15,

120 to 126]. Those Jews living in the town, which in 1941 numbered around 3,000 to 6,000 [N.T. 1–98; 3–50], were also forced into the ghetto [N.T. 3–111; 6–13, 88 to 89]. One of these persons testified at the trial that, at the time of the German occupation of the town, she was visited at her home by Germans and in the process of forcing her to leave her home she was brutally beaten, resulting in her nose and spine being broken [N.T. 6–77].

Life within the Rawa Ruska ghetto was not a matter of living but merely surviving. Beatings, strikings and other injurious acts of brutality toward members of the Jewish population were an everyday way of life. Soon after its formation, the ghetto was ravaged by an epidemic of typhus. Medicine and food were scarce [N.T. 3–11 to 113; 6–18]. Overcrowding was typical, with as many as 18 people crowded into one room [N.T. 6–18].

In Rawa Ruska, as elsewhere, the German occupying forces enacted a series of "special laws" applicable only to the Jewish population, which included a variety of degrading and dehumanizing practices, procedures and policies. For example, Jews over the age of 12 were required to make and wear on their upper-left arms an armband with the Star of David in conspicuous dimension. They were forbidden to leave the ghetto during the day without authorization and were absolutely forbidden to leave at night. If they were caught outside the ghetto without permission or without the identifying armband, they could be shot on sight. One further degrading practice was the forbidding of Jews to walk on the sidewalks of the town [N.T. 3–23; 4–104 to 105; 6–13].

The Germans also coerced members of the Jewish population who were able to work to engage in forced labor [N.T. 4–105 to 106] of the most dehumanizing sort. One detail involved Jewish laborers uprooting and smashing gravestones in an old Jewish cemetery in order to provide crushed stone for roads [N.T. 4–105 to 106]. These methods of persecution were only temporary because, as later events tragically prove, the

ghetto at Rawa Ruska was merely a detention center for its inhabitants who were awaiting—unbeknownst to them—transportation to the killing center at nearby Belzec. The actual act of delivery to Belzec was done in three operations. These episodes—referred to as "actions" by the Germans and the victims as well—were conducted pursuant to direct orders from Heinrich Himmler, who was the highest ranking command figure in the Nazi S.S. Himmler decreed that the Jews in Galacia be deported to death camps by the end of 1942 [N.T. 1–104; 4–111 to 112, 116 to 117]. His orders were tragically carried out in the town of Rawa Ruska in these three "actions." The "actions" occurred without warning in approximately March, July and December of 1942. Each action differed in method, but not in purpose or result. The first two actions in March and July of 1942 resulted in Jewish men, women and children being literally grabbed off the streets and from their dwellings in the ghetto, then thrown into trucks or forced to walk to the railway station in the town. There they were jammed into boxcars, with the assistance of rifle butts and bayonets, and then sent off to Belzec [N.T. 3–114 to 116; 4–88 to 91, 111 to 112, 114, 118 to 120; M.M. Banakh dep. at 34–36; S.D. Bakai dep. at 28–29; Kulikovska dep. at 29–34]. Those who attempted to escape were murdered [N.T. 6–27 to 29]. Each of these "actions" lasted from one to three days.

On December 9, 1942, the third and "final action," resulting in the literal liquidation of the ghetto at Rawa Ruska, took place in an effort by the Germans to make Rawa Ruska "free from Jews" [Ex. P–2 at 9]. The ghetto was totally destroyed. During this "final action," the entire remaining Jewish population was either shot or removed from the streets, dwellings or hiding places. Persons seized were taken outside of town to a cemetery and the few able-bodied males were retained for forced labor and the remainder taken away in trucks and never seen again. The acts of brutality during this final action, which lasted for weeks, were unspeakable. One witness testified that she saw small Jewish children

seized by the intruders and swung by their feet and their heads smashed against a wall [N.T. 6–94 to 95]. When all of the inhabitants of the ghetto had been removed, the ghetto was burned, dynamited and covered over until nothing remained but the smoking rubble and the charred bones of its prior inhabitants. All traces of Jewry had vanished [N.T. 3–42; 4–123 to 124; 6–127 to 131; Kulikovska dep. at 37–41; Straznik dep. at 23–28; Ex. P–2 at 11].

In January and February of 1944, the German occupying forces began to evacuate Rawa Ruska and, by the summer of that year, the Germans along with others had retreated from Rawa Ruska in the wake of the advancing Soviet forces [N.T. 3–52].

### (E) Defendant Osidach's Undisputed Activities From 1941 to 1944

In the 1941 to 1944 period, certain facts surrounding the activities of Osidach are not in dispute and were admitted by the defendant either at trial or in his pretrial deposition.

In June of 1941, Osidach returned to Rawa Ruska after the German forces had seized control of that town from the occupying Soviets [N.T. 2–160 to 161]. When he first arrived, Osidach lived with the Terpeluk family and worked for a short time from June to July of 1941 in a local dairy [N.T. 2–161 to 162]. In approximately August of 1941, he was asked by the commandant of the Ukrainian militia in Rawa Ruska to become the new commandant [N.T. 2–164]. At a public meeting, the Ukrainian people of Rawa Ruska asked Osidach to occupy that position [N.T. 2–162 to 163; Osidach dep. of September 9, 1980 (dep. 2) at 9–10]. The Ukrainian people of Rawa Ruska trusted Osidach because he knew the German language and was a Ukrainian nationalist and "would take in protection the Ukrainian people" [N.T. 2–163, 165; Osidach dep. 2 at 9–10]. The Ukrainian militia's function was to keep "order" in the streets of Rawa Ruska [N.T. 2–169; Osidach dep. 2 at 7]. There were approximately 15 to 25 men in the militia, all of them volunteers, and all under Osidach's command when he became the new commandant of the militia [N.T. 2–170; Osidach dep. 2 at 14]. At that time, there were no other police within the town of Rawa Ruska except the militia [Osidach dep. 2 at 12–13]. Furthermore, at that point in time, only the German army was present in the town. At a later time, the German civil administration resumed control [Osidach dep. 2 at 9, 13].

Osidach was the commandant of the Ukrainian militia for approximately three to four months, at which time the militia was disbanded by the Germans and was reorganized as the Ukrainian police. All of the militia members became members of the Ukrainian police [N.T. 2–17; Osidach dep. 2 at 8, 18]. This reorganization was supervised by Gregor Stockmahl, who was the commander of the Ukrainian police throughout the Rawa Ruska region [N.T. 2–171; 3–10; Osidach dep. 2 at 14]. The Ukrainian police were so named because they were composed exclusively of members of the Ukrainian population [N.T. 2–171].

In November of 1941, Osidach voluntarily went to the city of Lvov in Poland where for three months he was trained by Ukrainians, Poles and Germans to be a Ukrainian policeman [N.T. 2–173; Osidach dep. 2 at 19; Ex. P–7]. Part of that training included instruction in the use of rifles, which was conducted under the supervision of German instructors [N.T. 2–174]. The students at this school were recruited from throughout the entire Rawa Ruska region [N.T. 2–174 to 175]. Osidach was taught to "enforce the laws of Rawa Ruska" and "to apply [them] to the people" [N.T. 2–175] in order to keep "order" in the streets [N.T. 2–175]. Through his "military training," which Osidach says was "not enough" [Osidach dep. 2 at 36], he was trained to be a Ukrainian policeman [Osidach dep. 2 at 20, 36, 37].

When his training was completed in January of 1942, Osidach returned to Rawa Ruska equipped with the blue uniform of the Ukrainian police and bearing a pistol and holster, all of which he was to wear and did wear during the performance of his duties as a Ukrainian policeman [N.T. 2–176

to 178]. Osidach's sole employment upon his return to Rawa Ruska and until the summer of 1944 was that of a full-time member of the Ukrainian police in the town of Rawa Ruska [N.T. 2–182]. Osidach admits that his work assignment included two separate general duties. One was as an interpreter/clerk for the Ukrainian police, which work was performed at the Ukrainian police station in Rawa Ruska [Osidach dep. 2 at 47, 54 to 55]. Second, his general duties also included working on the streets of the town, whereby on an almost daily basis he was assigned to keep "order." In the performance of both duties, he acted in the capacity of a hauptwachman, a rank he attained sometime after his return to Rawa Ruska in January of 1942 [N.T. 2–182 to 183; 3–11 to 15, 16, 45; Osidach dep. 2 at 43 to 46; Ex. P–7, P–9].

The rank of hauptwachman was one grade higher than a "simple policeman" or wachman [N.T. 2–183; dep. 2 at 24, 28]. As a hauptwachman, Osidach carried a pistol, as opposed to the rifles that the other wachman carried [N.T. 3–4; Osidach dep. 2 at 42–43]. Osidach and the other wachman wore a blue uniform with a badge of the Ukrainian police. However, as the hauptwachman, Osidach gave the orders to the lower-rank wachman [N.T. 3–20 to 21], as he stated, "Naturally, because I was higher rank, and I have to give orders" [N.T. 3–44; Osidach dep. 2 at 47]. At any one time, Osidach states there were only about eight Ukrainian policemen in the town of Rawa Ruska [Osidach dep. 2 at 63]. At times, Osidach was called upon when additional police were needed on the streets [Osidach dep. 2 at 45]. All members of the Ukrainian police were paid not by the Ukrainian police but through a section of the civil

administration, which was at that time German controlled [Osidach dep. 2 at 24].

Finally, in the summer of 1944, while still a hauptwachman in the Ukrainian police, Osidach left Rawa Ruska with the retreating German army [N.T. 3–51].

## II. ILLEGAL PROCUREMENT

The Government's first major ground for denaturalization is based upon the first prong of § 1451(a)—that being that the defendant's citizenship should be revoked if it was illegally procured. This major theory of the Government is bottomed upon two separate arguments: (1) that the defendant was never lawfully admitted to the United States in 1949, which is a prerequisite to securing a valid citizenship under § 1427(a)(1)[4] of the Immigration and Nationalization Act of 1952 ("INA"); and, (2) in the alternative, the Government alleges that, when he applied for citizenship status in 1963, Osidach lacked the good moral character required to obtain a valid grant of citizenship under § 1427(a)(3).[5] Each of the Government's underlying theories will be separately considered.

### (A) *Unlawful Admission into the United States*

The Government's first theory based upon the contention of illegal procurement is further founded upon a two-point argument. First, it argues that Osidach was never lawfully admitted into the United States in 1949 because he was not an eligible displaced person under the Displaced Persons Act of 1948, Act of June 25, 1948, Pub.L.No. 80–774, 62 Stat. 1009, as amended by Act of June 16, 1950, Pub.L.No. 81–

---

4. 8 U.S.C. § 1427(a)(1) provides:
 (a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and

who has resided within the State in which the petitioner filed the petition for at least six months.

5. 8 U.S.C. § 1427(a)(3) provides:
 (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

555, 64 Stat. 219 (attached as Ex. A to Plaintiff's Pretrial Memorandum) ("DPA"). Second, the Government alleges that Osidach was never lawfully admitted into the United States in 1949 because he made a willful misrepresentation of a material fact for purposes of securing immigration status as a displaced person, in violation of § 10 of the DPA. Therefore, his entry as a displaced person under the DPA was illegal. Here, too, each argument under the Government's illegal-admission theory will be addressed separately.

(1) *Ineligibility as a Displaced Person*

(a) *Historical Overview*

In 1949, Osidach entered this country pursuant to an entry visa issued under the DPA. That visa was issued by a vice-consul working in conjunction with the Displaced Persons Commission ("DPC"). Both worked under the applicable provisions of the DPA. The DPC was an organization created under the DPA to administer the provisions of the Act. The Government claims that Osidach was not eligible to be a displaced person as defined by the DPA.

The DPA was enacted as a special emergency form of immigration legislation by Congress in 1948. Its passage was directly attributed to a historical reality of World War II ("WW II")—that being the propagation of approximately eight million persons from throughout eastern and western Europe who constituted the displaced human by-product of the war. Those displaced persons included not only civilian refugees from war-torn areas but also prisoners of war, forced laborers and those fortunate survivors of the German concentration and death camps. As a result of the repatriation and resettlement policies formulated at the 1945 Yalta Conference, many of these displaced persons were voluntarily resettled in various areas. However, over one million remained homeless for a variety of economic and political reasons, S.Rep. 950, 80th Cong., 2d Sess. 8, reprinted in [1948] U.S. Code Cong.Serv. 2028, 2035 ("S.Rep. 950"). Of these, many became residents of temporarily created camps located throughout Germany and other countries. *Id.* at 2036. These displaced persons camps were organized and operated by the Preparatory Commission for the International Refugee Organization ("IRO"), a United Nations-established post-war interim agency with its purpose being to assist with the problems posed by the refugees and displaced persons produced by WW II. The IRO functioned pursuant to the provisions of the then-proposed IRO Constitution, which became effective in 1948 after being accepted by 15 nations of the United Nations, including the United States which became a signatory in 1947, Act of July 1, 1947, Pub.L.No. 80–146, 61 Stat. 214. The IRO Constitution, 62 Stat. 3037–3055 (1946), provided for the screening and classification of persons through procedural mechanisms staffed by IRO personnel to certify persons of "concern" to the IRO under the IRO Constitution as eligible displaced persons for IRO purposes. This in turn facilitated their resettlement to those countries accepting the IRO constitutional goals. The United States received displaced persons under this temporary measure and contributed 79% of the total contributions received by the IRO for approximately one year until June 25, 1948, when the DPA was passed by Congress, S.Rep. 950 at 2037.

The DPA was specifically enacted by Congress as a unique form of humanitarian legislation providing for the granting of entrance visas to this country to certain defined eligible persons, with notable exceptions, after a thorough investigatory screening and certification of approval by personnel organized and supervised by the DPC, *see* §§ 8, 10 of DPA. The burden of proof was on the person seeking displaced persons status under the DPA, *see* § 10 of DPA. In form, the DPA served to greatly enlarge the prior immigration quotas under the then-existing United States immigration laws, *see* § 3(a) of DPA. Under the DPA, quota limitations were temporarily restructured with a limit of 202,000 immigration visas being issued to eligible displaced persons over a two-year period beginning in 1948, *see* § 3(a) of DPA. In

1950, this was amended to provide for 341,-000 persons over a three-year period starting from 1948, Act of June 16, 1950, Pub. L.No. 81–555, § 4, 64 Stat. 219, 221. Congress provided that, in the event this enlarged quota resulted in an excess over the annual quota limitations imposed under the Immigration Act of May 26, 1924, Pub. L.No. 68–139, § 12, 43 Stat. 153, 160–161, the excess number would be subtracted up to 50% from those annual quotas in the next succeeding fiscal year in which a quota was accorded, *see* § 3(b) of DPA. Therefore, while the legislation served to alleviate a severe existing problem, it had the added effect of "mortgaging" the quota restrictions for other aliens from some countries for years in the future, *see* 1 C. Gordon & H. Rosenfield, *Immigration Law & Procedure*, § 1 at 1–13 (2d rev. ed. 1979). *See generally* Note, Misrepresentation and Materiality in Immigration Law—Scouring the Melting Pot, 48 *Fordham L.Rev.* 471, 471–473 (1980).

It was under this specially created legislation that Osidach in 1949 benefited by securing status and entry into the United States as a displaced person.

It is his status as an eligible displaced person that the Government now contests. The Government argues that, when Osidach entered this country in 1949 under the DPA, he was not an eligible displaced person as defined by the DPA and, hence, he was never legally admitted into this country, thus lacking a requirement under § 1427(a)(1) of the INA.

The Government bases its assertion that Osidach was an ineligible displaced person by reference to § 2 of the DPA, 62 Stat. 1009–1010, which incorporated by reference the definition of "refugees or displaced persons" contained within Annex I of the IRO Constitution which, in turn, contained the following exclusionary provision:

*Persons who will not be the concern of the Organization.*

1. War criminals, quislings and traitors.

2. *Any other persons who can be shown* :

(a) *to have assisted the enemy in persecuting civil populations of countries,* Members of the United Nations; or

(b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations.[7]

---

[7] Mere continuance of normal and peaceful duties, not performed with the specific purpose of aiding the enemy against the Allies or against the civil population of territory in enemy occupation, shall not be considered to constitute "voluntary assistance." Nor shall acts of general humanity, such as care of wounded or dying, be so considered except in cases where help of this nature given to enemy nationals could equally well have been given to Allied nationals and was purposely withheld from them. [Footnote in original.]

3. Ordinary criminals who are extraditable by treaty.

4. Persons of German ethnic origin, whether German nationals or members of German minorities in other countries, who:

(a) have been or may be transferred to Germany from other countries;

(b) have been, during the second world war, evacuated from Germany to other countries;

(c) have fled from, or into, Germany, or from their places of residence into countries other than Germany in order to avoid falling into the hands of Allied armies.

5. Persons who are in receipt of financial support and protection from their country of nationality, unless their country of nationality requests international assistance for them.

6. Persons who, since the end of hostilities in the second war:

(a) have participated in any organization having as one of its purposes the overthrow by armed force of the Government of their country of origin, being a Member of the United Nations; or the overthrow by armed force of the Government of any other Member of the United Nations, or have participated in any terrorist organization;

(b) have become leaders of movements hostile to the Government of their country of origin being a Member of the Unit-

ed Nations or sponsors of movements encouraging refugees not to return to their country of origin;

(c) at the time of application for assistance, are in the military or civil service of a foreign State.

62 Stat. 3051–3052 (emphasis supplied). See Ex. B attached to the Plaintiff's Pretrial Memorandum at Annex I, Part II.

The Government claims that Osidach's affiliation with the Ukrainian police in the town of Rawa Ruska from 1942 to 1944 places him within the second category of persons defined by the above IRO constitutional provision. See Part II at 2(a).

In regard to the Government's allegation of ineligibility as a displaced person under its theory of illegal admission, the Court finds the recently decided case of *Fedorenko v. United States*, —— U.S. ——, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981) to be controlling as to many of the legal issues presented in this case. At the same time, the Court is quick to note that it believes that the instant case poses factual and legal issues that were either not before or not decided by the *Fedorenko* Court. The resolution of these other issues by this Court will not be inconsistent or contrary to the holding in *Fedorenko* and its statutory interpretation of the DPA but, rather, will hopefully serve to build upon that decision.

In *Fedorenko*, the Supreme Court affirmed the judgment for denaturalization by the United States Court of Appeals for the Fifth Circuit, 597 F.2d 946 (5th Cir. 1979), which had reversed the district court, 455 F.Supp. 893 (S.D.Fla.1978). In summary, the Supreme Court held that the defendant, Fedorenko, had illegally procured his citizenship under 8 U.S.C. § 1451(a) because he willfully misrepresented a material fact to the Displaced Persons Commission in 1949 when he applied for admission to the United States as a displaced person. The Court found his conduct violative of § 10 of the DPA. Section 10 provides:

*No eligible displaced person shall be admitted* into the United States unless there shall have first been a thorough investigation and written report made and prepared by such agency of the Government of the United States as the President shall designate, regarding such person's character, history, and eligibility under this Act. *The burden of proof shall be upon the person who seeks to establish his eligibility under this Act. Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States.* No eligible displaced orphan or eligible displaced person shall be admitted into the United States under the provisions of this Act except in pursuance of the regulations of the Commission, but, except as otherwise expressly provided in this Act, the administration of this Act, under the provisions of this Act and the regulations of the Commission as herein provided, shall be by the officials who administer the other immigration laws of the United States. Except as otherwise authorized in this Act, all immigration laws, including deportation laws, shall be applicable to eligible displaced orphans and eligible displaced persons who apply to be or who are admitted into the United States pursuant to this Act.

62 Stat. 1013 (emphasis supplied).

The material fact which Fedorenko misrepresented was his service as a concentration camp armed guard during WW II, which the Supreme Court found, if disclosed to the DPC, would have resulted in his being declared ineligible for an entry visa under the DPA as a displaced person. *Id.* at ——, 101 S.Ct. at 750.

In determining the materiality of Fedorenko's factual misrepresentation, the Supreme Court did not apply the test of materiality that had been previously articulated in *Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1960). Instead, the *Fedorenko* Court limited the holding of the *Chaunt* decision to situations involving misrepresentations in applications for *citizenship* and not to false statements provided in *visa* applications which concern

initial entry into the United States.[6] *Id.* —— U.S. at ——, 101 S.Ct. at 748. As to the latter category of cases, the Supreme Court found in determining materiality under § 10 of the DPA that the standard was: "At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." *Id.* at ——, 101 S.Ct. at 748. The *Fedorenko* Court found that, as a matter of law, Fedorenko was ineligible for a visa under the DPA based upon § 2(b) of the DPA, which incorporated by reference the exclusionary provision of the IRO Constitution cited *supra*. *Id.* at —— nn.3, 4, ——, —— n.33, 101 S.Ct. at 741 n.3, 4, 748, 750 n.3. In applying that standard of materiality, the Court accepted the district court's findings that Fedorenko had not been personally involved in the crimes and atrocities committed against the inmates in the concentration camp at Treblinka. *Id.* at —— & n.19, —— & n.24, 101 S.Ct. at 744 n.19, 746 n.24. The Court did find, nevertheless, that the defendant had assisted the enemy in the persecution of civilians during WW II due to his service as an armed, uniformed and paid guard at that camp. *Id.* at —— & n.34, 101 S.Ct. at 750 n.34. The Court noted that the assessment under the DPA did not hinge on the voluntariness of the person's actions because the word "voluntary" was not contained within the specific IRO constitutional provision incorporated into the DPA. *Id.* at —— & n.35, 101 S.Ct. at 751 n.35. Rather, the Court found that the focus should be "on whether particular conduct can be considered assisting in the persecution of civilians." *Id.* at —— n.34, 101 S.Ct. at 750 n.34. *But see* —— U.S. ——, 101 S.Ct. 760–763 (Stevens, J., dissenting).

The *Fedorenko* Court's findings in that regard were based only upon "the plain language and Jenkins's [prior vice-consul administering the Displaced Persons Act] uncontradicted and unequivocal testimony" that:

> Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. *On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.* Other cases may present more difficult line-drawing problems but we need decide only this case. As for the District Court's concern about the different treatment given to visa applicants who had served in Axis combat units who were found eligible for visas if they could show that they had served involuntarily, this distinction was made by the Act itself.

—— U.S. —— n.34, 101 S.Ct. 750 n.34 (emphasis supplied).

This Court believes that the case at bar presents the anticipated situation of a "more difficult line-drawing problem" of which the *Fedorenko* Court spoke, but in a slightly different manner. This Court finds that the instant case presents different factual and legal issues from those raised in the *Fedorenko* case on appeal. The crux of the difference between this case and the *Fedorenko* decision is that *Fedorenko* was based solely upon a claim under § 10 of the DPA, while this case is founded not only upon § 10 but another statutory provision of the DPA as well. That particular statutory provision, which was not addressed by the Supreme Court in *Fedorenko*[7] in its

---

6. *But see* —— U.S. ——, 101 S.Ct. 753 (Blackmun, J., concurring); —— U.S. ——, —— n.8, 101 S.Ct. 757, 759 n.8 (White, J., dissenting). *See* Note, Concealment of Facts Forestalling an Investigation in Denaturalization Proceedings, 47 *Univ. Chicago L.Rev.* 588, 602 (1980).

7. The *Fedorenko* Court did not address § 13 or its legislative history because its applicability was neither raised in the Court of Appeals or district court, nor argued before the Supreme Court by the parties on appeal. *See* Brief for Petitioner, *Fedorenko v. United States, supra* at ii; Brief for the Respondent, *Fedorenko v. United States, supra* at 39–43.

interpretation of the standard of materiality under the DPA nor was it raised by the Government in this case, is § 13 of the DPA, which provides:

> No visas shall be issued under the provisions of this Act to *any person who is or has been a member of, or participated in, any movement* which is or has been hostile to the United States or the form of the government of the United States.

62 Stat. 1014 (emphasis supplied). *See* Ex. A attached to Plaintiff's Pretrial Memorandum.

This Court is convinced that § 13 goes to the heart of this case and other cases based upon denaturalization claims under the DPA alleging ineligibility as a displaced person because of prior affiliation with "movements" assisting the enemy in the persecution of innocent civilians during WW II.

However, in order to understand the applicability of § 13 to this case and to additionally understand how that provision can be nevertheless consistently applied to the findings and holdings in the *Fedorenko* decision, it is imperative to examine briefly the legislative history of the section itself. *See* Appendix for a treatise regarding the legislative history of § 13.

### (b) *Application of the Fedorenko Decision to § 13 of the DPA*

It must be recalled that the *Fedorenko* decision was based upon an interpretation of § 10 of the DPA. The Supreme Court did not have reason to consider the implications of § 13 of the DPA in its interpretation of what constitutes a material fact warranting a finding of ineligibility under the DPA. In the context of the case before us, the plain language of the DPA indicates that §§ 10 and 13 are interrelated, in the sense that § 10 requires a misrepresentation of a material fact and § 13 serves to define in part what can constitute a material fact warranting a finding of ineligibility. Ineligibility under the DPA is not always deter-

mined only through the initiation of a § 10 claim, as in *Fedorenko*, but can also be asserted under § 13 with or without a companion § 10 claim.

■ Section 13's relationship to § 10 is clearly seen exemplified in the situation of a person appearing before the DPC for determination of eligibility status in 1949 but not being asked any questions concerning his war-time activities. In *Fedorenko*, the defendant had been asked on two separate occasions by the DPC and the vice-consul about his war-time activities. —— U.S. ——, ——, 101 S.Ct. 743, 748. If a person was neither asked by interview nor by written application of his war-time activities, there would be no duty under § 10 to disclose that information. Although that fact would be material, there can be no duty to disclose where it was not asked. This is because § 10 only applied to "misrepresentations" and not to "concealments" of material facts. *Compare* 8 U.S.C. § 1451(a). A misrepresentation implies an active role by providing a false or misleading response to a direct or even an indirect question. *See U. S. v. Accardo*, 113 F.Supp. 783, 785–786 (D.N.J.1953), *aff'd per curiam*, 208 F.2d 632 (3d Cir.) (failure to disclose other arrests when asked constitutes concealment). *See also* 3 Gordon & Rosenfield, *supra*, § 20.4b at 20–14, 15. If the element of a passive concealment could be read into § 10, decisional authority correctly suggests that there could be no misrepresentation or concealment of a material fact when the interviewee or applicant has not been asked anything concerning that fact. *See U. S. v. Minerich*, 250 F.2d 721, 730–732 (7th Cir. 1957) (no duty to disclose information not questioned about); *Cufari v. United States*, 217 F.2d 404, 409 (1st Cir. 1954) (no evidence question orally asked by INS and, therefore, no duty to disclose information not requested). *See also Maisenberg v. United States*, 356 U.S. 670, 672–673, 78 S.Ct. 960, 962, 2 L.Ed.2d 1056 (1958) (no concealment or misrepresentation where the question asked was ambiguous). *But see United States v. Palmeri*, 52 F.Supp. 226, 227 (E.D.N.Y.1943).

Furthermore, the legislative history of § 10 of the DPA indicates a concern only over the submission of fraudulent documents or statements in order to secure eligible displaced persons status under the IRO system. No mention is made of an affirmative duty to disclose information which was not asked for. *See* S.Rep.No. 950, 80th Cong., 2d Sess. 27 (1948); 94 Cong.Rec. 6446–6447 (1948) (remarks of Senator Wiley); 94 Cong.Rec. 6864 (1948) (remarks of Senator Revercomb); 94 Cong.Rec. 6897 (1948) (remarks of Senator Baldwin); 94 Cong.Rec. 6904 (1948) (remarks of Senator Eastland). *See also infra* at A–2, 4 n.35.

It would be fundamentally unfair to place upon a person the duty to disclose information not asked for. Otherwise, the reach of the duty would be as far and as varied as the undisclosed imagination of the interviewer concerning his belief in his mission. The concept of "fraud" cannot settle securely in *that* setting.

■ By contrast, under § 13, a person may be ineligible under the DPA simply because he falls within a predetermined excludable category of persons, *even though* no misrepresentation of a material fact has been made by that person—that is, even when that status rests on the undisclosed truth.

Congressional history shows that there was concern about persons who were members or participants of certain types of movements, *as well* as persons securing displaced persons status by advancing false information or documents, which practice had prevailed under the pre-1948 IRO screening process. *See infra* at A–2, 4a n.35. Therefore, § 10 and § 13 were aimed at different problems but naturally were interrelated to a limited degree. Section 10 was designed to cover a misrepresentation of material facts even beyond those material facts defined by § 13. For example, a person could misrepresent (a § 10 violation) their past history of prostitution. *See* 1 Gordon & Rosenfield, *supra*, §§ 1.2(b) at 2.44b. Congress was additionally concerned about this category of persons (prostitutes) gaining entry into the United States as displaced persons. *See infra* at A–3, 4b n.37. However, such person's ineligibility under the DPA was not merely dependent upon their misrepresenting the material fact of their history of prostitution before the DPC but their ineligibility could rest on their categorical status as a prostitute alone, without the need for a § 10 misrepresentation. Section 13 set forth other examples of such categorical ineligible status under the DPA.

In *Fedorenko*, the Supreme Court defined materiality under § 10 by examining the IRO constitutional exclusionary provision incorporated by reference under § 2(b) of the DPA. Had the Court felt the need to have § 13 and its legislative history before it, as we do now, it surely would have seen that § 13 incorporates the same IRO constitutional exclusionary provision as § 10 and plainly attempted to further define what constituted a person "assisting in the persecution" of civilians. This legislative purpose is made clear from the following excerpt from the legislative debates:

The point I make first of all is that we have joined the International Refugee Organization, which was set up by the United Nations, and through the other body, we have become a party in the support of that Organization. *That Organization has defined who are displaced persons and who are not. We will now take up their definition of who are not displaced persons.* You will understand that all through this measure, we are dealing with displaced persons.

In annex I, part 2, they say:

Persons who will not be the concern of this Organization.

I begin with (4):

Persons of German ethnic origin, whether German nationals of members of German minorities in other countries who (a) have been or may be transferred to Germany from other countries; (b) have been during the second World War evacuated from Germany to other countries; or (c) have fled from or into Germany or from their places of residence into other countries other than Germany in order to

avoid falling into the hands of the Allied Armies.

There are your three definitions of these groups which the International Refugee Organization will not consider as displaced persons.

I refer again to the bill. Under subsection (c) of section 2, I read:

The term "displaced person" shall not include any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States.

94 Cong.Rec. 7878 (1948) (emphasis supplied) (remarks of Rep. Graham, member of House Committee on the Judiciary and Joint Conference Committee). *See also* 94 Cong.Rec. 7872–7873 (1948).

Under § 13, Congress further defined the act of assisting in the persecution of civilians as being a "member of, or participant in, a movement" that persecuted civilians. Section 13, therefore, expanded upon the somewhat vague IRO provision. *See Fedorenko, supra,* ——— U.S. ———, 101 S.Ct. 761 (Stevens, J., dissenting).

While incorporating the IRO provision, § 13 added a limitation that was not contained within the IRO section. As indicated by the plain words of § 13, the assistance shown by participation or membership must be coupled with a movement which itself persecuted civilians. Assistance without movement affiliation was not proscribed by the 1948 version of § 13. However, when speaking of assistance by way of participation in a movement, that act of participation must, as set forth by the *Fedorenko* Court, in and of itself involve some personal activity involving persecution.

It was not until the 1950 amendments to the DPA that Congress included within the § 13 exclusion persons committing acts of persecution *without regard* to movement affiliation. The 1950 amendment to § 13 of the DPA provided as follows:

Sec. 11. Section 13 of the Displaced Persons Act of 1948 is amended to read:

"Sec. 13. No visas shall be issued under the provisions of this Act, as amended, to any person who is or has been a member of the Communist Party, or to any person who adheres to, advocates, or follows, or who has adhered to, advocated, or followed, the principles of any political or economic system or philosophy directed toward the destruction of free competitive enterprise and the revolutionary overthrow of representative governments, or to any person who is or has been a member of any organization which has been designated by the Attorney General of the United States as a Communist organization, or to any person who is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States, *or to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin,* or to any person who has voluntarily borne arms against the United States during World War II. Upon arrival at the port of entry in the United States, every person eighteen years of age or older authorized to be admitted under this Act, shall take and subscribe an oath or affirmation that he is not and has never been a member of any organization or movement named in this section, and shall be liable to prosecution for perjury if such oath or affirmation is willfully false. If any person not entitled to a visa under this section shall nevertheless gain admission to this country, in addition to the penalty above-mentioned, such person shall, irrespective of the date of his entry, be deported in the manner provided by sections 19 and 20 of the Immigration Act of February 5, 1917, as amended."

Act of June 16, 1950, Pub.L.No. 81–555, § 11, 64 Stat. 219, 227 (emphasis supplied).

Significantly, the "member of or particip[ant] in any movement" language remained in the Act; but a further category of persons was added, as indicated by the emphasized language above. Although that addition is only minimally discussed in the congressional reports and debates antecedent to the 1950 amendments to the DPA,

the Court has found a very helpful reference in the hearings before the Subcommittee No. 1 of the Committee on the Judiciary of the House on H.R. 1344, 81st Cong., 1st Sess. (1949), during which Mr. Ugo Carusi, the chairman of the DPC, was asked about the proposed amendment to § 13. He stated:

> Mr. Carusi. As a practical matter, it causes us no great difficulty, but if I went in and told you why it ought to be eliminated, we would get into a discussion which you would say I should not enter into, it is policy. I am not entering into that.
>
> Now, I think I have said all I need to say on the inland transportation. That explains itself.
>
> There is a provision which merely adds a few lines to section 13. That is the line that says the people who are participants in movements hostile to the United States should be excluded. We all know what that means, but there is some question as to whether or not a person might be active and still not be a member of a movement that is hostile, so just to button that up a little more tightly we add the words that if he participated in the persecution of anyone for race, religion, or nationality reasons, that he shall be excluded, and then we will not have to prove he is a member of any outfit, we can show what his conduct was and bar him by that.
>
> I think that explains itself.
>
> Then there is the provision which relates to section 12, which relates to ethnic Germans and you remember making the German quota available to that group. Our only point on that is simply this and it was heightened by a colloquy in the Senate the other day in which one Senator was insisting the Displaced Persons Commission, particularly Mr. Carusi, was flouting the will of Congress by not processing these ethnic German cases. The fact is, it is none of our business. The law does not authorize us to. There is that misunderstanding because it happens to be in the Displaced Persons Act. The amendment as proposed says move it over into its right place so that misunderstanding won't exist. We get a lot of correspondence on cases like that. It slows us down. As I say, in Congress, there was the suggestion that we were violating the law by not processing them. You gentlemen can tell me whether we should.
>
> We do not go into the merits of that at all. We just say put it where it belongs in the code book.

Hearings at 75. *See also* Hearings at 3 (containing amendment). *See also* S.Rep.No. 1237, 81st Cong., 2d Sess. 6 (1950), *reprinted in* [1950] U.S.Code Cong. Serv. 2513, 2519; Conf.Rep.No. 2187, 81st Cong., 2d Sess. (1950), *reprinted in* [1950] U.S.Code Cong.Serv. 2520, 2524; H.Rep.No. 581, 81st Cong., 2d Sess. 27 (1949). *See generally* 2A Sutherland, *Statutes and Statutory Construction*, § 48.10 at 209, § 48.16 at 222 (4th ed. 1972).

The Supreme Court's *Fedorenko* interpretation of materiality under the DPA is totally consistent with § 13 because it falls, albeit unintentionally, squarely on the "participant" prong of § 13. In that regard, the Supreme Court stated that:

> [B]ut in focusing on whether particular conduct can be considered assisting in the *persecution* of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

—— U.S. —— n.34, 101 S.Ct. 750 n.34 (emphasis in original).

■ That interpretive language tells us the standard to be applied when determining whether a person is to be constituted a "participant" within the language of § 13. It is additionally helpful in determining what constitutes "persecution," whether it be by a participant [8] of a movement, or a member of a movement. The Supreme Court in *Fedorenko* was, in effect, tracking the interpretive process that Congress had previously used in 1948 when examining that same IRO exclusionary provision to determine what assisting in the persecution of civilians was to mean. The Supreme Court in *Fedorenko* did not find it necessary to extend its interpretation, as Congress did, to also define "assisting" to mean membership in a movement that persecuted civilians—quite aside from the concept of personal participation. This is shown in the legislative history of § 13 where Congress spoke both in terms of personal participation in acts of persecution and in terms of mere membership without personal participation. *See infra* at 73–75.

In applying § 13 to the *Fedorenko* conduct, it is clear defendant Fedorenko clearly exemplified a person who assisted in the persecution of civilians by being a participant in a movement. His participation constituted his service as an armed, uniformed and paid guard at a concentration camp where he shot at fleeing inmates. His actions, which the Supreme Court found to be acts of persecution, were as a participant in a movement which itself persecuted civilians. That movement was the agency that conceived, constructed, managed and controlled the concentration camp enterprise at Treblinka that had as its policy—by the most brutal means imaginable—the persecution of civilians, and to which agency Fedorenko willingly accepted the status of a loyal, obedient subordinate for pay.

■ This case *sub judice* presents somewhat of a prologue to the *Fedorenko* decision, because it concerns a person who was both a personal participant under § 13 (like Fedorenko) *and* a willing member of a movement which assisted the Germans in the persecution of civilians during WW II in the town of Rawa Ruska. The latter constituting an issue which the *Fedorenko* Court did not decide. This Court's decision, therefore, is that defendant Osidach was ineligible under both prongs of § 13 as a displaced person making his 1949 entry into this country invalid and illegal.

### (c) *Membership Under § 13 of the DPA*

■ The Court holds that, under § 13 of the DPA, mere willing membership—without proof of personal participation in acts of persecution—in a movement that persecuted civilians is sufficient to warrant a finding of ineligibility as a displaced person. The Court bases that holding upon three separate grounds: (1) the plain language of the statute; (2) the legislative history underlying the statute; and, (3) the administrative interpretation of the IRO Constitution incorporated by reference into the DPA, as found in the *Fedorenko* decision.

■ The Court also finds that § 13, as so construed, is not violative of any constitutional provision.

---

8. In *Fedorenko*, the Supreme Court, in interpreting the DPA of 1948, relied heavily upon and cited at great length the testimony of an expert witness, Kempton Jenkins, who was a vice-consul administering the DPA in Germany in 1949. He was accepted, without objection from the petitioner at trial, "as an expert witness on the interpretation and application of the DPA." —— U.S. ——, 101 S.Ct. 743. His testimony set forth a very broad administrative approach under the DPA as to ineligibility standards. This Court obviously is not bound by the testimony of an expert in another proceeding. However, this Court *is* bound by the interpretations of the DPA by the Supreme Court in *Fedorenko* which are based upon both "the plain language of the statute and Jenkins' uncontradicted and unequivocal testimony." —— U.S. ——, 101 S.Ct. 750. The latter was afforded great weight by the Supreme Court in reaching its final interpretation of the DPA. *See* 2A Sutherland, *supra* at § 49.05 at 248. This Court is bound not by the evidentiary underpinnings upon which the Supreme Court's interpretation of the DPA is based but only upon the conclusive interpretive findings and comments the Supreme Court reached, of which its statements at —— U.S. —— n.34, 101 S.Ct. 750 n.34 are an example.

First, it is clear from the plain meaning of the words of the statute that Congress intended that membership be sufficient under § 13. That section provides: "... *any* person who is or has been a *member* of, *or participant* in, *any* movement..." (emphasis supplied). The statutory language contains no qualification as to the degree or quality of that membership, or whether it be passive or active.[9] *Fedorenko* tells us in regard to the issue of whether voluntariness was required under the IRO exclusionary provision:

> Under traditional principles of statutory construction, the deliberate omission of the word "voluntary" from § 2(a) compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas. See *National al Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458 [94 S.Ct. 690, 693, 38 L.Ed.2d 646] (1974); *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 [49 S.Ct. 129, 131, 73 L.Ed. 379] (1929). As this Court has previously stated: "We are not at liberty to imply a condition which is opposed to the explicit terms of the statute.... To [so] hold ... is not to construe the Act but to amend it." *Detroit Trust Co. v. The Barlum*, 293 U.S. 21, 38 [55 S.Ct. 31, 35, 79 L.Ed. 176] (1934). See *Federal Trade Comm'n v. Sun Oil Co.*, 371 U.S. 505, 514–515 [83 S.Ct. 358, 364, 9 L.Ed.2d 466] (1963).

—— U.S. ——, 101 S.Ct. 750. *See also* —— U.S. —— n.35, 101 S.Ct. 751 n.35.

Second, the statute is phrased in the disjunctive such that a person who is or has

been "a member of, *or* participant in, any movement..." (emphasis supplied) is ineligible under the DPA. The use of the conjunctive "or" indicates that two separate categories of persons were intended to be covered. Those categories are: those who were *members* in a movement and those who were *participants* in a movement but who lacked membership status. As stated previously, it is the second (participant) prong of § 13 that speaks to the degree of personal activity, and not the first (membership) prong. Any other construction would render the phrase "member" meaningless, because persons personally "participating" in a movement would include by definition both active members and non-member participants. By phrasing the statute in the manner it did, Congress was in effect making the initial presumption that mere willing members in movements were responsible for the persecutive actions of a movement to which they belonged, without additional proof of personal participation in those acts. The addition of the participant-prong of § 13 broadened the scope of the provision tŏ include persons who were not members—and, hence, held automatically responsible—but had committed personal acts in affiliation with the movement which itself also committed similar actions.

This statutory construction is further supported by the legislative history of the DPA of 1948. H.R.Rep.No. 1854, as previously noted, when discussing § 2(c) of the House bill, the predecessor to § 13, clearly stated that:

> The committee wishes to emphasize at this point that several specific provisions

**9.** In *Fedorenko,* the Supreme Court found that voluntariness was not required in regard to a person's acts of assistance or *participation* in the persecution of civilians. *See* —— U.S. ——, ——, 101 S.Ct. 750, 752. This Court does note, however, that a voluntary or willful requirement does appear to have been envisioned in regard to § 13 in both the legislative and administrative history of the statute, although admittedly not expressly set forth in the statute. *See* 94 Cong.Rec. 6865 (1948) ("voluntarily joined subversive organizations") (remarks of Senator Eastland). *See generally infra* at 75– to 76 for the full remarks of Senator Eastland. *See also* Segat dep. at 31–32, 53–54,

64–65 (whether membership was voluntary or involuntary would make a difference for purposes of determining eligibility under the IRO Constitution, incorporated by reference into the DPA as held by the *Fedorenko* Court, *see infra* 113–114). *See* —— U.S. ——, 101 S.Ct. 750. However, in order to be consistent with the *Fedorenko* holding, the Court finds that the voluntary or willful requirement only serves to modify the membership language of § 13 and not the participant prong and will be so applied throughout this Opinion. *See* —— U.S. —— – ——, 101 S.Ct. 761–762 (Stevens, J., dissenting).

of H.R. 6369 are designed to enable consular officers abroad and immigration authorities in this country to prevent from entering the United States any and all undesirable elements, such as persons with bad moral records, persons afflicted with diseases making them inadmissible, or persons whose presence in this country may endanger its public safety—Communists and *members or former members of movements or groups which during the war rendered and comfort to the enemies of the United States*. It is the consensus of the committee that in the administration of the act those safety measures should be strictly adhered to and meticulously enforced.

H.R.Rep.No. 1854, 80th Cong., 2d Sess. 15 (1948) (emphasis supplied). *See also* 94 Cong.Rec. 7740 (1948) (remarks of Rep. Fellows).

During the legislative debates, several references were made that serve to define the terms "participant" and "member" in § 13. In regard to the meaning of the term "participant," references were used that explain its meaning as including "people who . . . assist," 94 Cong.Rec. 7872 (1948); "Nazi fifth columnists," 94 Cong.Rec. 9019–9020 (1948); "follows of Hitler" and "Nazi follows," 94 Cong.Rec. 7873–7874 (1948); "gauleiters" and "quislings," 94 Cong.Rec. 7873, 9019–9020 (1948); "adherents of nazism," "agents of Hitler" and "facilitated the Reichswehr blitz," 94 Cong.Rec. 7873 (1948); and, "persons who supported Hitler," 94 Cong.Rec. 9022 (1948). Without more, these references might be construed to mean that only participants, which would include only active members, were intended to be included under § 13. However, the repeated references to membership alone, without qualifying phraseology, convinces the Court that willing membership status alone was intended to be enough. Those references include: "members of the celebrated fifth column," 94 Cong.Rec. 7876 (1948); "members of movements which during the war rendered aid and comfort to our enemies," 94 Cong.Rec. 7740 (1948); "agents and others belonging to subversive organizations," 94 Cong.Rec. 6865 (1948); "members of subversive organizations," 94 Cong.Rec. 6865 (1948); "persons . . . affiliated with subversive groups," 94 Cong.Rec. 6190 (1948).

The only qualifying restriction as to willing membership does not go to the type or personal degree of membership but, rather, to the type of movement in which a person is a member. As noted, Congress did not want to classify all members of the ethnic Volksdeutsche group excludable merely because some Volksdeutsche, as members of smaller Volksdeutsche-composed groups, had rendered aid and comfort to the enemy. *See infra* at 110 to 112. That type of reasoning would imply that Congress intended narrower lines to be drawn as to movement composition in general. For example, being a Ukrainian, without more, would not be enough to be excluded under § 13, even though it might be proven that some Ukrainians in Ukrainian-composed groups had rendered aid and comfort to the enemy. The Court believes that it is also within the spirit of § 13 that Congress did not intend that mere willing membership in the Ukrainian police would entail individual responsibility and, hence, exclusion under § 13 for the actions of all Ukrainian police throughout Galacia during WW II. The Court believes movement classification was intended to be drawn in narrower circles but not so narrow as to require personal participation in acts of persecution under the membership-prong of § 13.

The statutory construction of mere membership is further supported by the notion that § 13 was not merely designed to cover collaborating war movements but communist organizations as well. The grave concern many legislators exhibited in 1948 over the threat of communist infiltration into displaced persons camps and entry into the United States as displaced persons is clearly shown throughout the legislative reports and debates. *See infra* at 107 to 108, 109 n.36. Therefore, Congress' intent to wield a broad brush in dealing with the communist problem under § 13 had the effect of making mere membership in a communist organization sufficient, without

more, to constitute exclusion as an eligible displaced person.

The membership-prong of § 13 did not differentiate between membership in a communist organization and membership in a movement rendering aid and comfort to the enemy during WW II. Therefore, the requirement of mere membership, without more, under § 13, thought necessary by Congress in 1948 to stop the threat of communism, is equally applicable as a matter of statutory construction to membership in other movements additionally covered under § 13.

Finally, the DPA was enacted by Congress to assist many different types of displaced persons. In particular, its passage was aimed at helping those persons who had been persecuted by the enemy for their religious, nationalistic and ethnic beliefs during WW II. Section 2(c)(1) of the DPA provides that eligible displaced persons means anyone who "was a victim of persecution by the Nazi government and was detained in, or was obliged to flee from such persecution. . . ." This legislative concern was repeatedly and forcefully asserted throughout the committee reports and leg-

islative debates.[10] *See* S.Rep.No. 950, 80th Cong., 2d Sess. 8–9 (1948).

Therefore, the Court finds that it would be totally contradictory for Congress, on the one hand, to assist those who were truly victims of acts of persecution and then, on the other hand, afford those same benefits under the DPA to those persons who were willing members of movements who assisted the enemy in persecuting those same victims. *See* 94 Cong.Rec. 9019–9020 (remarks of Senator Pepper).

In conclusion, the Court is convinced that in 1948 Congress very much intended for persons who were mere willing members in movements which had persecuted civilians to be excludable under § 13 of the DPA.

Third, in *Fedorenko*, the Supreme Court, as previously discussed, held that the IRO exclusionary provision had been incorporated into the DPA by § 2(b). This Court has additionally found that provision was also incorporated into the DPA by § 13 and further defined in the process.

Therefore, the administrative interpretation that had been afforded that IRO provision should be afforded some weight by this Court in the same manner that the *Fedor-*

---

10. The following series of remarks made during the legislative debates of the DPA typify the intent of Congress in 1948 as to the persons the DPA was designed to help:

But let me say to you quite frankly that all of these good people from Latvia, Estonia, Lithuania, the Ukraine, Yugoslavia, Poland, Czechoslovakia, and other countries are those poor devils who were conquered and who were taken over at bayonet point by the Germans. Many of their loved ones, their wives and their children were slaughtered like pigs before their very eyes. Their homes, and their possessions were sacked and burned. In addition they were subjected to unconscionable personal indignities by maniacal perverts and sadists and those who were then physically able; were marched off to German concentration camps at the point of a gun and tattooed like branded cattle. . . .
94 Cong.Rec. 7750 (1948) (remarks of Rep. Chelf, member of Joint Conference Committee).

There were some 8,000,000 persons who were actually displaced because of the war. As the Nazi armies swept across western Europe, Poland, and the Balkan States, and then into Russia, they tore thousands of such

persons forcibly from their homes and from their farms and from their families, and drove them into Germany, there to work in their fields and factories, or, if they had political or religious influence, to be placed in the concentration camps at Buchenwald, Dachau, Flossenburg, Auschwitz, or the other places of horror about which we have heard.
94 Cong.Rec. 6452 (1948) (remarks of Senator Cooper, member Senate Committee on the Judiciary and Subcommittee to Investigate Immigration and Naturalization).

Many of these poor people fled from fear of pogroms and other persecution in Poland, the Ukraine, and the Balkan states. They are, in fact, displaced persons, the same as those who entered the camps before them. They are the victims of the anti-Semitic drive started by Hitler in his outrageous persecutions of the Jewish people during the war, with its resulting aftermath, leaving literally thousands of homeless persons without a country and not wanted. To discriminate against these people would not be in keeping with the spirit which motivates the legislation we are now considering.
94 Cong.Rec. 6860 (1948) (remarks of Senator Smith).

*enko* Court afforded weight to the particular expert testimony in that case. *See* 2A Sutherland, *supra*, § 49.05 at 238–239; Nathanson, Administrative Discretion in the Interpretation of Statutes, 3 *Vanderbilt L.Rev.* 470 (1950).

At trial, the Government introduced into evidence the deposition testimony of Daniel Segat ("Segat"), who from 1948 to 1952 was employed by the IRO first as an eligibility officer determining the eligibility status of displaced persons under the IRO Constitution [dep. at 5–7] and later as a member of the four to five member eligibility review board of the IRO reviewing, lower-level eligibility decisions numbering in the hundreds. Finally, Segat became the chief eligibility officer for the entire IRO [dep. at 14–15].

Segat was qualified as an expert in the administrative interpretation of the IRO Constitution [N.T. 9–5].

The Court finds his testimony to be credible, consistent and unequivocal and will, therefore, be afforded significant weight.[11] The Court found Segat's employment experience with the IRO to have resulted in his being personally exposed to those persons and movements upon which he based his expert testimony [dep. at 8–9, 13, 30, 76]. He testified that the provisions of the IRO Constitution were uniformly applied by the IRO [dep. 15–18].

Segat unequivocally testified under direct and cross-examination to the following:

A. In general terms, the examination was to see whether the refugee was what we call a bonafide [*sic*] refugee. In other words, anybody who collaborated with or helped in any way or in any fashion the Germans was automatically excluded.

\* \* \* \* \* \*

A. The focus and concern of these interviews was to see whether the refugee was in any way, in any shape or form connected with organizations that helped Germans, either militarily or to persecute civilian populations. That was the focus.

\* \* \* \* \* \*

A. The majority were cases who were denied eligibility [on appeal] because of the fact that they belonged to various organizations that helped Germans.

\* \* \* \* \* \*

Q. Do you recall what part of the IRO constitution these principles were stated in?

A. If I recall exactly, in Part II of the annex to the constitution.

Q. In general, what was that standard stated in the annex?

A. The standard stated in the annex was that anyone who gave assistance to the enemy, either by serving in the enemy forces or by serving in auxiliary forces or in military or civilian forces supervised by the Germans were prima facie ineligible.

Q. In practice, in terms of dealing with particular organizations or memberships, how did you interpret that principle?

A. This principle was interpreted strictly. Anybody who belonged to any of those organizations was deemed ineligible and the burden of proof was on him to prove with witnesses or some other way that he was indeed not involved.

Q. What kinds of organizations are you referring to?

A. I am referring to organizations that were created or sponsored by the Germans.

Q. What would be examples of some of these organizations?

---

11. Osidach objects to the testimony of Segat because he admitted that the IRO Manual [Ex. P–40], with which the IRO personnel worked, did not specifically contain a reference to the Ukrainian police being an ineligible organization for purposes of the IRO [Segat dep. at 25–26]. The Court notes that Segat also stated that the IRO Manual did not contain a listing of all organizations meant to be proscribed, but that other organizations not listed were often found by the IRO through independent means to also be excludable organizations [dep. at 25–26]. The Court, therefore, finds that the IRO Manual, although relied upon by the IRO, was merely a model setting forth examples of the types of organizations that should be proscribed and was not intended or utilized by the IRO to be an all-inclusive document.

A. They were organizations of Latvians who collaborated with the Germans, of Lithuanians, Ukrainians, Russians. There they were both people in uniform or out of uniform. Some of them had simply bands to indicate that they belonged to some such organization.

Q. If it was discovered that an applicant was a member of one of these organizations, what would happen to him in terms of eligibility process?

A. He would be declared ineligible.

Q. Did you yourself review such cases?

A. Yes.

Q. What findings did you make when you determined that applicants were members of such organizations?

A. I declared them ineligible.

Q. In making a finding of ineligibility in such cases, what kind of evidence was required?

A. The evidence, for example, admission of the refugee, if he simply admitted that he was a member of any of these organizations, if we found out from national committees that they knew of his membership in such an organization. A national committee was a committee of refugees that cooperated with IRO. We had outside information from outside sources about their membership.

Q. How uniformly were the standards on eligibility with regard to these organizations applied by the IRO?

\* \* \* \* \* \*

A. The standards were applied uniformly. As the chief eligibility officer, it was my job to see to it they were followed uniformly.

\* \* \* \* \* \*

Q. Based on your experience in the IRO, first as a field eligibility officer and then as a member of the review board and then as chief eligibility officer of the IRO, if it were learned that an applicant for eligibility status was a member of the Ukrainian police during the German occupation, what determination would have been reached as to his eligibility for IRO assistance?

A. Ineligible.

Q. That would have been the determination?

A. Right.

Q. If it had been learned that an applicant was an officer of rank with the Ukrainian police, again based on your experience, what determination would have been reached?

A. Ineligible.

Q. Based on your knowledge of practices throughout the IRO, how likely is it that an IRO field officer in some other office other than the one that you served would reach a different determination on those facts?

\* \* \* \* \* \*

A. Very unlikely.

\* \* \* \* \* \*

A. At what time? During the German occupation?

Q. Yes.

A. Yes.

\* \* \* \* \* \*

Q. What you are telling me is that in any country occupied by the Germans from the time that they started their policy of aggression that any official in any police force in any of those occupied countries would be declared ineligible by the IRO?

A. That is correct.

Q. So that not one person who is a member of the police force in any of the occupied countries could be declared eligible by the IRO, is that correct?

A. That is correct.

Segat dep. at 7, 8–9, 13, 15–17, 20–22.

Furthermore, Segat testified that he had specifically been exposed to cases of refugees stating that they were "members of the Ukrainian police" and, of those approximately 10 to 20 cases of which he had knowledge, *all* were denied eligibility status. In some of these cases, Segat testified that he had personally conducted the initial interviews and denied them eligibility status as a displaced person under the IRO

Constitution [dep. at 30]. He also stated that it made no difference if the person was an officer or an enlisted person, as long as they were a member of the particular organization found to have assisted the Germans in persecuting civilians [dep. at 31–32]. Finally, he testified that if a person, as a member, served in the capacity of an interpreter that he was denied eligibility based on that employment capacity alone [dep. at 32].

Therefore, from the expert testimony of Segat, it is clear that membership alone, without proof of personal participation in an organization assisting in the persecution of civilians, was sufficient under the IRO Constitution, which was incorporated into the DPA, to warrant denial of displaced persons status. His administrative interpretation is further supportive of the plain language of § 13 of the DPA and the legislative history of that Act and should, therefore, be afforded significant weight.

Before concluding, the Court notes that the Government also presented at trial the expert testimony of Ralph Fratske ("Fratske"), who had served as a vice-consul visa-issuing officer assigned in 1949 to the displaced persons program in Germany under the DPA [N.T. 7–55]. He testified to the administrative interpretation and usage of the DPA as it was applied in determining eligibility of displaced persons. The Court found his testimony regarding ineligibility status under the DPA to be of limited assistance. Fratske testified that, if an applicant disclosed information concerning their war-time activities, he would refer the case for further investigation by the investigatory branch of the DPC. He stated that those types of war-time activities warranting referral, as posed in the following hypothetical question that was asked of him, to include:

Q. In the oral interview which you have described, the applicant discloses to you that he had been a police officer of some senior rank in the Ukrainian police from 1941 following the German occupation with no prior police experience until the German evacuation of 1944, and those facts were nowhere in the documents reflected?

A. I would have referred it.

N.T. 7–69.

Although his testimony is totally consistent with the plain language of the statute, the legislative history of § 13 and the testimony of Daniel Segat from the IRO, it has limited evidentiary value. That is, because he was not asked whether the DPC—under the administrative interpretation and usage he, as an expert, was familiar with—would have denied such a person, as posed in the hypothetical question, displaced persons status *after* the investigatory results had confirmed the stated factual allegations. This is especially important because Fratske stated that not all cases that were referred for further investigation were automatically denied eligibility later [N.T. 7–78]. *See Fedorenko, supra,* —— U.S. —— n.15, 101 S.Ct. 744 n.15.

Therefore, the testimony of Fratske does not serve to contradict or undermine the other interpretive analyses this Court has utilized to determine the interpretation to be afforded to § 13; nor does it serve to any large degree to support or aid those analyses, since it falls short in its evidentiary value.[12]

In conclusion, the Court finds that the plain language of § 13, supported by the legislative history of the DPA and the uncontradicted and unequivocal testimony of IRO expert Segat "leave no room for doubt." *Fedorenko, supra,* —— U.S. ——, 101 S.Ct. 750, that mere willing membership without proof of personal acts of persecu-

12. Osidach challenges the testimony of Fratske because he claimed he was not familiar with the IRO field eligibility manual [Ex. P–40] used by the IRO [N.T. 7–74]. The Court fails to see the flaw in his assertion. As long as the practices of the DPC were comparable with those expressed in the IRO Manual, it is irrelevant that Fratske was familiar with the document since he relied upon the DPA in his interpretation, which incorporates by reference the IRO constitutional exclusionary provision upon which the IRO Manual is based. The Court finds Fratske's testimony to be consistent with § 13 and, hence, the IRO provision.

tion in a movement which assisted the Germans in the persecution of civilians during WW II was sufficient under § 13 of the DPA to warrant a denial of eligibility as a displaced person.

### (d) *Constitutional Limitations*

Before applying the above membership standard under § 13 to the facts of the instant case, one final question must be addressed—that is, if it was the intent of Congress in 1948 in enacting § 13 of the DPA to preclude those persons from being eligible displaced persons who were willing members of movements which persecuted civilians during WW II without the necessity of showing that those persons were active participating members in the actions of those movements, does § 13 then violate the due process right of freedom of association guaranteed under the Constitution? The Court finds that it does not.

The Court is fully cognizant of the existing line of judicial authority which states that mere membership, without more, does not hold a member responsible for the actions of an organization to which he or she belongs. That conclusion was reached by the United States Supreme Court in a series of decisions in the 1940's and 1950's involving the denaturalization of persons claimed to be communists and American Nazi Party members under differing statutory provisions than those present here. Initially, the Court held, in *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), involving the denaturalization of a member of the American Communist Party, that denaturalization was not warranted because:

> Apart from his membership in the League and the Party, the record is barren of any conduct or statement on petitioner's part which indicates in the slightest that he believed in and advocated the employment of force and violence, instead of peaceful persuasion, as a means of attaining political ends. To find that he so believed and advocated it is necessary, therefore, to find that such was a principle of the organizations to which he belonged and then impute that principle to him on the basis of his activity in those organizations and his statement that he subscribed to their principles. The Government frankly concedes that "it is normally true . . . that it is unsound to impute to an organization the views expressed in the writings of all its members, or to impute such writings to each member . . ." But the Government contends, however, that it is proper to impute to petitioner certain excerpts from the documents in evidence upon which it particularly relies to show that advocacy of force and violence was a principle of the Communist Party of the United States in 1927, because those documents were official publications carefully supervised by the Party, because of the Party's notorious discipline over its members, and *because petitioner was not a mere "rank and file or accidental member of the Party," but "an intelligent and educated individual" who "became a leader of these organizations as an intellectual revolutionary."*
>
> \* \* \* \* \* \*
>
> In the first place this phase of the Government's case is subject to the admitted infirmities of proof by imputation. The difficulties of this method of proof are here increased by the fact that there is, unfortunately, no absolutely accurate test of what a political party's principles are. Political writings are often over-exaggerated polemics bearing the imprint of the period and the place in which written. Philosophies cannot generally be studied *in vacuo*. Meaning may be wholly distorted by lifting sentences out of context, instead of construing them as part of an organic whole. *Every utterance of party leaders is not taken as party gospel. . . .*

320 U.S. at 146–147, 154, 63 S.Ct. at 1346–1347, 135 (footnotes omitted) (emphasis supplied). *See also Baumgartner v. United States*, 322 U.S. 665, 677, 64 S.Ct. 1240, 1246, 88 L.Ed. 1525 (1944) (Frankfurter, J.) (attendance at a Nazi Party meeting was not enough to show association with that

group for the systematic agitation of Nazi views).

Later, in *Knauer v. United States*, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946), Justice Douglas, writing for the majority of the Court in a denaturalization case involving an American Nazi Party member, held that, although denaturalization *was* warranted:

> The District Court properly ruled *that membership in the Bund was not in itself sufficient to prove fraud which would warrant revocation of a decree of naturalization. Otherwise, guilt would rest on implication, contrary to the rule of the Schneiderman and Baumgartner cases.* But we have here much more than that. We have a clear course of conduct, of which membership in the Bund was a manifestation, designed to promote the Nazi cause in this country. This is not a case of an underling caught up in the enthusiasm of a movement, driven by ties of blood and old associations to extreme attitudes, and perhaps unaware of the conflict of allegiance implicit in his actions. Knauer is an astute person. He is a leader—the dominating figure in the cause he sponsored, a leading voice in the councils of the Bund, the spokesman in the program for systematic agitation of Nazi views. His activities portray a shrewd, calculating, and vigilant promotion of an alien cause. The conclusion seems to us plain that when Knauer forswore allegiance to Hitler and the German Reich he swore falsely.

328 U.S. at 669, 66 S.Ct. at 1312 (footnotes omitted) (emphasis supplied). *See also Aptheker v. Secretary of State*, 378 U.S. 500, 509–514, 84 S.Ct. 1659, 1665–1667, 12 L.Ed.2d 992 (1964) (holding that § 6 of the Subversive Activities Control Act of 1950, 64 Stat. 993, was unconstitutional on its face because it made application or use of a passport by a member of the Communist Party a felony based on membership alone "without more," "the sole criteria," "irrelevant [of] the member's degree of activity in the organization and his commitment to its purposes" a disqualification for obtaining a passport); *Nowak v. United States*, 356 U.S. 660, 665–668, 78 S.Ct. 955, 958–960, 2 L.Ed.2d 1048 (1958) ("the record shows at best from the Government's standpoint that Nowak was an active member and functionary of the Communist Party. But this proof does not suffice to make out the Government's case, for Congress in the Nationality Act of 1940 did not make membership or holding office in the Communist Party a ground for loss of citizenship"); *Yates v. United States*, 354 U.S. 298, 331, 333, 77 S.Ct. 1064, 1083, 1084, 1 L.Ed.2d 1356 (1957) ("mere membership or the holding of office in Communist party" was not sufficient without more, which would include the showing of "overt acts," to uphold a Smith Act prosecution).

In the instant case, the Court is faced with a statutory provision of a much different nature. Its application concerns the determination of whether an *alien's* initial entrance into this country was legal under federally enacted laws of immigration. Section 13 is not being applied as in the above judicial decisions to determine whether an already determined *legal resident* of the United States can be deprived of his citizenship status after so procuring it as a legal resident. Here, the Court is addressing a more basic issue—that being whether citizenship can be revoked on the theory of illegal procurement under § 1451(a) when the initial entry of an *alien* into this country is being challenged as constituting an illegal admission.

Congress has imposed certain terms and conditions for securing valid citizenship. One requirement is that an applicant for citizenship has been a legal resident prior to application for at least five years. 8 U.S.C. § 1429. *See also* 8 U.S.C. § 1427(a). In turn, to be a legal resident, a person must have first been a legal entrant into this country, which requires that they had a valid unexpired immigration visa at the time of entry. *See Fedorenko, supra,* —— U.S. ——, 101 S.Ct. 752. Under the DPA, § 13 stated that no visas should be provided to certain types of persons. Therefore, visas later found to have been issued to such persons are retroactively invalid in the

same way that visas secured by misrepresentation of a material fact are also invalid. *See Fedorenko, supra,* —— U.S. ——, 101 S.Ct. 752. If under § 13 the visa was invalid, then that person's entry into this country under the DPA was illegal and, hence, their later grant of citizenship would be illegally procured because they were not a lawful resident of this country.

Therefore, in the instant case, this Court is determining whether a person was a legal resident which is based on the initial determination of whether they were legally admitted to this country through a valid visa under the DPA in light of § 13. As such, this case is addressing in part the broader issue, in the first instance, of the rights of aliens under § 13 of the DPA to secure entry into this country and not the rights of legal residents in having their citizenship revoked. In that procedural and substantive posture, the following reaffirming statement of the Court in *Fedorenko* is applicable:

> An alien who seeks political rights as a member of this nation can rightfully obtain them only upon the terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare.

—— U.S. ——, 101 S.Ct. 753, *quoting U. S. v. Ginsberg,* 243 U.S. 472, 474–475, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917).[13]

The constitutionality of § 13 of the DPA goes to the question of the rights of aliens under the immigration laws to secure entry into this country and, as such, concerns Congress' "plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress had forbidden." *Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967). In that regard, the Supreme Court in *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), stated: "Congress regularly makes rules that would be unacceptable if applied to citizens," 426 U.S. at 80, 96 S.Ct. at 1891, or, in a similar vein, to legal residents of this country. In the instant case, we are dealing with a power, "[i]n accord with ancient principles of the international law of nation-states...." *Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 2582, 33 L.Ed.2d 683 (1972). The most recent pronouncement by the Supreme Court in this area serves as a continued reaffirmation of the limited scope of judicial review that exists when reviewing immigration legislation:

> At the outset, it is important to underscore the limited scope of judicial inquiry into immigration legislation. This Court has repeatedly emphasized that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Oceanic Navigation Co. v. Stranahan,* 214 U.S. 320, 329 [29 S.Ct. 671, 672, 53 L.Ed. 1013] (1909); accord, *Kleindienst v. Mandel,* 408 U.S. 753, 766 [92 S.Ct. 2576, 2583, 33 L.Ed.2d 683] (1972). Our cases "have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei,* 345 U.S. 206, 210 [73 S.Ct. 625, 628, 97 L.Ed. 956] (1953); see, e. g., *Harisiades v. Shaughnessy,* 342 U.S. 580 [72 S.Ct. 512, 96 L.Ed. 586] (1952); *Lem Moon Sing v. United States,* 158 U.S. 538 [15 S.Ct. 967, 39 L.Ed. 1082] (1895); *Fong Yue Ting v. United States,* 149 U.S. 698 [13 S.Ct. 1016, 37 L.Ed. 905] (1893); *The Chinese Exclusion Case,* 130 U.S. 581 [9 S.Ct. 623, 32 L.Ed. 1068] (1889). Our recent decisions have not departed from this long-established rule. Just last Term, for example, the Court had occa-

---

**13.** Furthermore, as will be shown, Osidach was not only, under the first prong of § 13, a willing member of the Ukrainian police in the town of Rawa Ruska from 1942 to 1944, but he was also a participant, under the second prong of § 13, in acts of persecution against innocent civilians both in his role as an interpreter and as a street policeman in the Ukrainian police. As such, his activities fulfill the due process requirements set forth in *Schneiderman, supra,* and progeny. *See infra* at 96–100.

sion to note that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 [96 S.Ct. 1895, 48 L.Ed.2d 495] (1976), citing *Fong Yue Ting v. United States, supra* [149 U.S.] at 713 [13 S.Ct. at 1022;] accord, *Mathews v. Diaz*, 426 U.S. 67, 81–82 [96 S.Ct. 1883, 1892, 48 L.Ed.2d 478] (1976).

*Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977).

The constitutional challenges to immigration laws restricting the entry of certain types and classes of aliens have been brought in a variety of constitutional contexts and have been repeatedly upheld by the Supreme Court and other lower courts. *See* 1 Gordon & Rosenfield, *supra*, at § 2.2a.

Involving a challenge based upon the due process clause, particularly relevant to the case at bar, Justice Frankfurter, writing for the Court in *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), stated:

But the slate is not clean. As to the extent of the power of Congress under review, there is not merely "a page of history"... but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government....

We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens....

347 U.S. 531–532, 74 S.Ct. at 742–743.

In *Fiallo, supra*, the Court stated in regard to the *Galvan* decision: "We are no more inclined to reconsider this line of cases today than we were five years ago when we decided *Kleindienst v. Mandel....*" 430 U.S. at 793 n.4, 97 S.Ct. at 1478 n.4.

The judicial reasoning that has been advanced for this limited scope of judicial review has been stated as:

We are dealing here with an exercise of the Nation's sovereign power to admit or exclude foreigners *in accordance with perceived national interests.* Although few, if any, countries have been as generous as the United States in extending the privilege to immigrate, or in providing sanctuary to the oppressed, limits and classifications as to who shall be admitted are traditional and necessary elements of legislation in this area.

*Fiallo, supra*, 430 U.S. at 795 n.6, 97 S.Ct. at 1479 n.6 (emphasis supplied). *See also Fiallo, supra*, at 798–799, 97 S.Ct. at 1481.

In an earlier decision, the Supreme Court in *Mathews v. Diaz, supra*, further stated:

Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of *classifications must be defined in the light of changing political and economic circumstances,* such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.... The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

426 U.S. at 81–82, 96 S.Ct. at 1892 (emphasis supplied), cited with approval in *Fiallo, supra*, 430 U.S. at 796, 97 S.Ct. at 1480. *See also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589, 72 S.Ct. 512, 518–519, 96 L.Ed. 586 (1952).

In the instant action, this Court has undertaken the only "limited judicial review," *Fiallo, supra*, 430 U.S. at 795–796 n.6, 97 S.Ct. at 1479–1480 n.6, that has until now been defined by the United States Supreme Court—that being to determine exactly what Congress intended to be the scope and application of § 13 of the DPA. *See Fiallo,*

*supra*, 430 U.S. at 797 n.7, 97 S.Ct. at 1480 n.7. We have thoroughly and carefully examined the reasons, policies and underlying concerns expressed by Congress in 1948 after it had undertaken a first-hand investigation of the displaced persons problem in Europe, had rigorous committee hearings and meetings, as well as extensive and often-heated floor debate. It was as a direct result of this democratic process that the compromise of politics was reached and § 13 became codified. This Court cannot and should not attempt to reconstruct the postwar mentality of Congress, and presumably the American people whom they represent, now in 1981 and substitute its own political or moral judgment for that of Congress. The "inevitable process of 'line drawing,'" *Fiallo, supra*, 430 U.S. at 795 n.6, 97 S.Ct. at 1479 n.6, has already been undertaken by Congress by making willing membership, without more, sufficient under § 13 to warrant the denial of entry into this country as a displaced person. The Court has found that § 13 was intended as such and was within the power of Congress to so enact, and this judicial body will not disturb that decision by turning back the hands of time and engage in legislative second-guessing.

(2) *Osidach's Ineligibility as a Displaced Person*

Based upon the above membership standard of § 13 of the DPA, the Court must now determine, under the applicable burden of proof, that (1) the Ukrainian police in the town of Rawa Ruska during WW II constituted a movement that assisted the Germans in the persecution of innocent civilians; and, (2) if it was, that Osidach was a willing member of that movement during the relevant periods in question.

(a) *Role of the Ukrainian Police Throughout Galacia From 1941 to 1945*

The Government presented the testimony of Dr. Raul Hilberg ("Hilberg") at trial, who was qualified as an expert in the subject of the Holocaust [14] upon which his book was based, which was introduced into evidence as Ex. P–1 [N.T. 1–84]. Hilberg testified that, based upon his expert opinion, formulated after years of research and the review of thousands of documents located in various depositories throughout the world, including the National Archives, during the German occupation during WW II of the western Ukraine, or Galacia, extensive use was made by the Germans of other indigenous forces in order to effectively accomplish their goals of the concentration and the eventual extermination of the Jewish population in that area. Hilberg testified as follows as to how this was done:

Inasmuch as the Jewish population adjacent to the starting off line was very heavy, most were not killed—repeat—not killed—by these Einsatzgruppen. These stayed behind in very large pockets. It is therefore to be understood that after the occupation of those territories which were initially conquered, that is to say, the Eastern part of pre-war Poland, the German order police as well as the security police spilled over, that is, thinned out, since there wasn't enough German police to be brought in from Germany itself and establish itself in these new territories. However, in that part of what we have called here the Western Ukraine, but which the Germans called Galacia, the personnel utilized was Ukrainian.

This Ukrainian police was placed under the order police. Just a[s] Polish police was placed under the German order police as an integral unit of stationary personnel.

In addition, not perhaps completely relevant but possibly of interest, Ukrainians were also utilized in units of so-called battalions employed in combat, deployed in death camps, deployed at ghettos.

---

14. The Court will accept and utilize, for purposes of this Opinion, the definition of the phrase "Holocaust" that was testified to by Dr. Hilberg as:

[t]he systematic destruction by physical means of the Jewish population of Europe under the German-Nazi regime between 1933 and 1945.

They took part, for example, in the Warsaw ghetto battle of 1943.

N.T. 1–93 to 94. *See also* N.T. 1–105.

One of those indigenous forces utilized by the Germans in Galacia was the Ukrainian police. Hilberg stated that they were used to carry out deportations of Jews throughout the area and other forms of anti-Jewish policies [N.T. 1–94 to 95, 105, 106, 107, 116, 117]. Hilberg's opinion as to the role of the Ukrainian police throughout Galacia was based upon his extensive archival research and years of study [N.T. 1–104, 105, 115, 118, 119 to 124]. He stated that, in his expert opinion, the Ukrainian police were used in Galacia for work in the death camps, for ghetto deportations. [N.T. 1–94]. He testified that, during the mass deportations of Jews in Galacia, every unit available was used by the Germans: "[A]nyone at all who could be trusted or who was armed could be mobilized." [N.T. 1–105]. These units, including the Ukrainian police, took part in round-ups, deportations and guarding the trains that took the Jews to the death camps [N.T. 1–105]. This pattern, Hilberg testified, took place throughout the Galacia region with the Ukrainian police used in a collaborating or assisting function with the Germans to carry out their systematic destruction of the Jewish civilian population in those areas. When asked if the Ukrainian police were also active in the town of Rawa Ruska within the Galacia region, Hilberg stated that it "would be inconceivable" for them to have not been involved in the persecution of civilians there [N.T. 1–117]. Hilberg stated that it was necessary as "a matter of administrative necessity" [N.T. 1–116], considering the overall civilian population of Galacia at the time—which numbered somewhere between five to six million, with the Rawa Ruska [N.T. 1–96 to 98]. Hilberg testified:

First, we have to keep in mind the overall ratio of forces. There were only approximately 12,000 German order policemen, perhaps 11,000—the number varied from area to area—and only about 1200 security police. Indigenous police, Poles and Ukrainians, numbered 16,000. N.T. 1–105.

Osidach presented his own expert to counter Hilberg's assertions. Dr. Petro Mirchuk ("Mirchuk"), qualified as an expert on Ukrainian nationalism and the OUN [N.T. 10–17], testified that the Ukrainian police were not involved in acts of persecution against Jews throughout Galacia, including the town of Rawa Ruska [N.T. 10–41]. However, Mirchuk [15] also testified that he had not done any independent research on the plight of the Jews in the Ukraine in the early 1940's, which would include research on the identity of their persecutors [N.T. 10–54].

The Court finds the expert testimony of Dr. Hilberg to be credible but limited solely to the role of the Ukrainian police throughout the Galacia region so as to indicate a general pattern of conduct. Hilberg himself admitted that his research was limited as to the specific role of the Ukrainian police in the town of Rawa Ruska [N.T. 2–4, 5; Ex. P–1 at 312]. It is the particular activities of the Ukrainian police in the town of Rawa Ruska which forms the basis of this litigation. Hilberg's testimony does serve as a focal point from which further proof can be mounted either in eyewitness or documentary forms. His testimony also serves to support to some degree the reliability and credibility of other evidence bearing upon the particular activities of the Ukrainian police in the town of Rawa Ruska. It serves to show that what occurred in that town was not an isolated instance of conduct but totally consistent with a general pattern of persecutory conduct throughout the Galacia region.

(b) *Role of the Ukrainian Police in the Town of Rawa Ruska From 1942 to 1944*

(i) *Documentary Proof*

The Government offered into evidence two separate documents in support of their

---

**15.** Dr. Mirchuk's admitted and perhaps explainable bias toward Osidach and the Ukrainian people in general heavily weighs against the credibility of his testimony regarding the WW II activities of the Ukrainian police [N.T. 10–48 to 50].

assertion that the Ukrainian police assisted the Germans in acts of persecution against civilians in the town of Rawa Ruska. Exhibit P–4 was presented and was figuratively called the "Katzman Report" because it was the report submitted to German superiors in 1943 by an S.S. officer named Katzman serving in a command capacity in the Galacia region during various stages of the systematic extermination of the Jews in that region. That report, specifically entitled "The Solution of the Jewish Question in Galacia," generally describes the various activities that took place in the "final action" throughout the region in June of 1943. It had been introduced into evidence at the initial post-war Nuremberg trials [N.T. 1–110 to 111]. Of particular concern to this Court for purposes of this litigation is a statement made in that report:

> Owing to the great number of Jews and the vast area to be combed out these Actions were performed with the assistance of detachments from the Security Police[,] the Order Police, the Gendarmarie, the Special Service, and the Ukraini[an] Police, all acting together in numerous single sweeps. P. 19 of this report contains a map intended to show how Jews lived scattered throughout the whole of the District, until the Special Jewish Residence Districts were established. The detachments continually were exposed to serious physical and mental strains. Again and again they had to overcome the nausea threatening them when they were compelled to enter the City and pestilential Jewish holes. During the searches there has been found, moreover, a number of leaflets in the Hebrew language, inciting the Jews to breed lice carrying Spotted Fever, in order to destroy the Police Force. In fact several phials [sic] filled with lice were confiscated. Nothing but catastrophical conditions were found in the Ghettoes [sic] of Rawa-Ruska and Rohatyn. The Jews of Rawa-Ruska, fearing the evacuation, had concealed those suffering from Spotted Fever in underground holes. When evacuation was to start the Police found that 3000 Jews suffering from Spotted Fever lay in this Ghetto. In order to destroy this center of pestilence. Ex. P–4 at 11.

Finally, Ex. P–6 constituted the report of the so-called "Rayon Commission," which was a civilian commission established in the town of Rawa Ruska shortly after the Soviets regained control of that area. The commission conducted hearings throughout the Rawa Ruska region and issued the report detailing the persecution of civilians and Soviet prisoners of war by the Germans and others during the German occupation of that area. Of concern here are specific references made in that report concerning the role of the Ukrainian police in the town of Rawa Ruska involving assisting the Germans in committing various acts of persecution. The report speaks of Ukrainian police having taken Jews to a bathhouse in the town in the spring of 1943 where they were shot by the S.S. [Ex. P–6 at 4]. It also refers to Ukrainian police assisting the Germans in the round-up of Jews in the town, particularly in March of 1942, when some 2,000 Jews were arrested and taken away by train [Ex. P–6 at 3]. In December of 1942, the Ukrainian police, the report states, assisted the Germans in gathering Jewish males for forced labor and taking others away in trucks. Some Jews, including women and children, at that time were killed, the report states, in the streets of the town by S.S., Gestapo and Ukrainian policemen [Ex. P–6 at testimony of Mendel Gokh at 1–2].

Both documents were referred to by Dr. Hilberg during his testimony and were admitted, not for the truth of their contents, but to serve as a documentary basis for Dr. Hilberg's expert opinion, detailed above, as to the role of the Ukrainian police throughout Galacia and, in particular, in the town of Rawa Ruska [N.T. 1–110 to 136]. Standing alone, these documents do not constitute conclusive proof of the actual role of the Ukrainian police in the town of Rawa Ruska because they only go to the weight of Dr. Hilberg's expert opinion. However, to the extent that they were substantiated by subsequent eyewitness testimony presented at trial, the evidentiary weight of the documents proportionately increases

and, in turn, so does the weight of Dr. Hilberg's expert opinion based upon them. Once again, neither the documents nor Dr. Hilberg's expert opinion, separately or together, without more, would be sufficient under the burden of proof the Government faces to prove the actual role of the Ukrainian police in the town of Rawa Ruska from 1942 to 1944. What they *do* provide the Court is an evidentiary stepping-stone upon which the following eyewitness testimony rests and is supported. In that regard, each element of proof serves to substantiate the other to produce a quantum of evidence which does meet the applicable burden of proof.

(ii) *Eyewitness Testimony*

 The Government at trial offered several live and videotaped eyewitnesses who each testified as to what they personally observed during their residency in the town of Rawa Ruska during the German occupation period.[16] Overall, the Court finds that their combined testimony points to four separate categories of activities in which the Ukrainian police were in fact engaged. The Court finds that each category in and of itself constitutes, under § 13, the assisting of the Germans in the persecution of innocent civilians in the town of Rawa Ruska during WW II.

(ii-a) *Enforcement of Ghettoization of Jews and Enforcement of Other Degrading Laws Enacted for the Jewish Population by the Occupying Germans*

Shlomo Altshuler [17] testified at trial that he was taken from his home within the ghetto at Potylitc in Galacia to the ghetto within the town of Rawa Ruska under

16. In considering the testimony of these witnesses, the Court has taken into consideration a variety of elements bearing upon the extent to which each of these witnesses can be said to have been reliable or credible and the weight to be given to their testimony, individually and combined. Those factors include: the fact that the events about which they testified took place some 40-odd years ago, in a different land and under extremely hostile and difficult wartime conditions that prevailed throughout Europe; the age of the witnesses at the time the events testified to took place; the opportunity that each witness had to personally perceive the events to which they testified; the extent to which any lay opinion furnished by a witness can be said to have been based upon a sufficient factual or perceptual underpinning to allow that opinion to be given weight; and, the difficulties in translation at trial or during the video depositions. To the extent that an objection was made challenging the accuracy of an interpreted question or answer, the Court has chosen to disregard any challenged testimony. Other factors that the Court took into account were: the indications of personal bias of a witness; the extent to which a witness' testimony was supported or contradicted by other evidence and particularly strong or uncontradicted documentary evidence in the case; the manner in which the witness testified, from the viewpoint of their manner; their sincerity to the extent that it could be perceived from their performance while testifying; the witness' responsiveness to questions; the extent to which the Court believed that the gravity of the event testified to may have been consistent with either the sharpness or the lapse of the memory of that event or vice-versa; and, the fact that an event testified to may have been a relatively unimportant or minor detail, as opposed to a matter of significance. Finally, the Court notes that a sequestration order was in effect throughout the entire trial, which precluded the witnesses from discussing their testimony with each other. The Court realizes that, because of the publicity which accompanied this trial, sequestration is of questionable value; nevertheless, in this case, the Court believes that sequestration was helpful.

17. Osidach attacks the general credibility and believability of witness Altshuler. The attack is based upon the cross-examination testimony of the witness where he stated he had never given an interview to any reporter from a Philadelphia newspaper in 1977 in Israel where he resides [N.T. 7–10 to 11]. The testimony of Stewart Bykofsky, a reporter from the Philadelphia Daily News, indicated that Altshuler was in fact interviewed by Bykofsky through the use of a Hebrew interpreter in Israel in 1977 [N.T. 11–71 to 72]. However, the testimony of Bykofsky does not in itself pose a direct challenge to the truth or falsity of Altshuler's prior statement. It is not clear on the present record whether Altshuler was ever informed by Bykofsky that he was a reporter, let alone from Philadelphia or, if he did so inform Altshuler, who only speaks Hebrew and not English, whether this point of information was translated to Altshuler by his interpreter. In this muddled light, the Court finds that whatever significance can be drawn by Altshuler's response as to bear upon his overall credibility is minor in comparison to the other major matters to

guard by both S.S. and Ukrainian police [N.T. 6–120 to 125]. He stated that the Ukrainian police were dressed in blue uniforms and carried rifles [N.T. 6–124 to 125]. Anna Weinfeld [18] testified at trial that she was ordered by two Ukrainian policemen in blue uniforms to leave her home in Rawa Ruska in the summer of 1942. They told her to leave within the hour and for her to move to the ghetto in the town [N.T. 6–88 to 90].

Kurt Lewin [19] stated during his trial testimony that in his job as a ragpicker, for

which he was provided a special work permit [N.T. 4–88], he moved daily about the streets of Rawa Ruska and the surrounding communities [N.T. 4–87, 88, 92]. During that time, he "periodically" observed Ukrainian policemen wearing dark blue uniforms and carrying rifles, with officers armed with pistols, patrolling the streets outside the ghetto [N.T. 4–91 to 92]. He also stated that he saw Ukrainian policemen assisting Germans in removing Jews from their homes [N.T. 4–88]. He testified that Ukrainian policemen also assisted the Germans in checking Jews without arm-

---

which Altshuler testified, which in the Court's view would have had a more lasting impression on his memory.

Finally, Ex. D–3, which is the newspaper article written by Bykofsky and others based in part on the Altshuler interview, is totally consistent as to its factual contents with the trial testimony of Altshuler concerning the events he witnessed as a resident of the town of Rawa Ruska during the German occupation.

18. Osidach also challenges the credibility of witness Anna Weinfeld because: (1) She testified that the star on the armband that Jews were required to wear was blue [N.T. 6–82] but her husband testified that the star was black [N.T. 6–40, 42, 63, 64]. The Court finds that, first, the testimony of Mrs. Weinfeld and her husband both indicated that the armbands were made by the Jewish population themselves and had to be a special size [N.T. 6–63, 103]. Mrs. Weinfeld did not say that they had to be a special color. Therefore, they could have differed by slight color variations. See also N.T. 4–142. Second, a perception between a star being black or being blue after 40 years is not so significant as to serve to undermine the remainder of a witness' otherwise credible testimony to which he or she was subject to rigorous cross-examination. Finally, Osidach himself admitted in his pretrial deposition that the Jews wore yellow stars [dep. 2 at 59]. (2) Her husband testified that he observed the final liquidation action through a small shutter in a window in a pharmacy where they were staying in the ghetto [N.T. 6–32 to 33]; however, she testified that he did not look out the window because he was afraid [N.T. 6–103 to 105]. Granted, there is a discrepancy in their combined testimony as to the method of observation each used in viewing the events constituting the final liquidation of the ghetto. However, their testimony is completely corroborative as to the events they both observed that night through that window. Both testified that they saw shooting [6–33; compare with N.T. 6–104]; a fire in the ghetto that night [N.T. 6–33; compare with N.T. 6–105]; people run-

ning [N.T. 6–33; compare with N.T. 6–94]; that the area was specially illuminated that night [N.T. 6–33; compare with N.T. 6–93 to 94]; and, perhaps most importantly, both testified that they saw Ukrainian police assisting the Germans in accomplishing acts of atrocity [N.T. 6–33; compare with N.T. 6–95].

Therefore, the Court finds that the discrepancy as to a relatively minor factual issue is completely overshadowed when compared to the more significant actions and circumstances following that minor event to which both witnesses testified without contradiction—each corroborating the testimony of the other.

19. Osidach additionally challenges witness Lewin's testimony, because he testified that there were three actions in the town of Rawa Ruska, the last of which he stated he observed occurred in October of 1942 when he left the city [N.T. 4–89, 98]. Osidach alleges that all other witnesses, including Osidach, testified that the "final liquidation" occurred between December of 1942 and January of 1943 [see N.T. 3–38, 50; 6–30, 117, 126, 127]. However, Lewin also testified that, when he left Rawa Ruska in October of 1942, there were somewhere between 10 to 12 thousand Jews remaining in the ghetto [N.T. 4–98] and when he returned in September of 1944 there were "hardly ten" Jews left [N.T. 4–98]. The Court, therefore, finds that Lewin, when he was speaking of the October of 1942 action involving Jews being taken from the ghetto, could not have been speaking of the final liquidation action which virtually eliminated the Jewish population in the ghetto. He did not say it was the "final liquidation," only the last he observed [N.T. 4–89]. To that extent, he could not have been present at the final liquidation in December of 1942 to January of 1943. Therefore, what was perceived in his mind to be the final liquidation action was only the final action he observed. The Court does not find this testimony to be in error but only a witness' subjective conclusion, which will not be found by the Court to be an objective fact.

bands or those out after curfew hour. For those infractions he stated that the penalty was to be shot on the spot [N.T. 4–92]. He personally saw such shootings for those infractions [N.T. 4–92]. He was checked by Ukrainian police for his work permit [N.T. 4–88]. He further testified that members of the Ukrainian police "were quite brutal to the population and sometimes provoked incidents, beating innocent people, women, kicking children...." [N.T. 4–92]. He also testified that he personally observed such beatings [N.T. 4–92].

In that regard, Abraham Weinfeld stated that he saw, on more than one occasion, Ukrainian policemen in navy blue uniforms walking the streets of the ghetto [N.T. 6–19 to 20]. He said at those times the Ukrainian police were usually walking in groups of two and were "always armed" [N.T. 6–20].

Witness Philip Langer [20] also testified at trial on cross-examination that the Ukrainian police had a "free hand" in Rawa Ruska and he stated that if the Ukrainian police

"decided to take, say, my kid or my brother's kid and just take him and beat him to death or take him and throw him anywheres [sic] he felt like it he could have done it...." [N.T. 4–160 to 161. See also N.T. 4–116, 141].

(ii-b) *Guarding and Abuse of Jewish Forced Laborers*

Witness Philip Langer testified that the Ukrainian police, along with the Germans, often literally grabbed Jews off of the streets of the ghetto when additional workers were needed than those that could be organized by the Judenrat (Jewish police) [N.T. 4–105, 108; see also N.T. 6–123]. He said that the Ukrainian police dressed in dark blue uniforms and along with the Germans took these laborers away for forced labor [N.T. 4–107, 108] and that this particularly happened to him [N.T. 4–108 to 109]. He also stated that the Ukrainian police that guarded the Jewish laborers had weapons [N.T. 4–107 to 108]. Abraham Wein-

---

**20.** Osidach challenges the general credibility of witness Langer based on his testimony on several points: (1) He described the armband worn by the Jews of Rawa Ruska as white with a black star, while other witnesses testified that it was white with a blue star [N.T. 4–105, 137, 138]. The contentions set forth by the Court at n. 18 *infra* are equally applicable here. (2) He *testified that the Ukrainian militia were* wearing uniforms in June of 1941 [N.T. 4–140]. Osidach testified at his pretrial deposition that the Ukrainian militia wore a "certain sort of blue and yellow clothes" [dep. 2 at 7]. In contrast, during his trial testimony, Osidach indicated that the Ukrainian militia wore no uniforms at all except a yellow and blue armband [N.T. 2–168]. Later at trial Osidach admitted that *some militiamen wore uniforms* from the Polish and Russian armies [N.T. 3–3]. What color these uniforms were was not indicated. Therefore, Osidach's own testimony is unclear as to whether the Ukrainian militia might have worn uniforms and what color they might have been. This confusion only serves to support the testimony of Langer in that particular respect and not to discredit it. (3) Langer *testified that he did not personally see* Jews being rounded up and brought from outside Rawa Ruska to the ghetto [N.T. 4–152 to 155]. In that regard, the Court believes that the testimony of other witnesses who were residents of the surrounding communities of Rawa Ruska, and not merely the town itself, as was Langer, clearly testified as to the round-

ups in surrounding towns by the Ukrainian police and others and their transportation to Rawa Ruska [N.T. 6–120 to 125]. (4) Langer also testified that non-Jews were allowed in the ghetto [N.T. 4–159]. The Court notes that Langer also testified that, while non-Jews were not officially permitted in the ghetto and if they were found there the gentile population of Rawa Ruska would be subject to reprisals, some of the gentile population did unofficially come into the ghetto by subverting the attentions of the Ukrainian police and the Germans [N.T. 4–159 to 161]. The Court finds this testimony totally consistent with that of other witnesses that it was not the policy of the Germans to allow non-Jews into the ghetto but that sometimes non-Jews did covertly enter the ghetto [N.T. 6–96, 97, 113, 114]. Osidach admitted at trial that such covert actions often took place although strictly officially prohibited. Osidach testified that "many Ukrainians have been hiding Jews and feeding them..." [N.T. 3–25, 34]. Osidach also testified that, although Jews were not allowed to leave the ghetto by themselves they sometimes did so "illegally to get some food" [N.T. 3–27, 25]. Perhaps these same Ukrainian people smuggled food *into* the ghetto as well. In any event, it is apparent that the official policy in Rawa Ruska was subject to exceptions, although inherently dangerous.

feld [21] testified that he also was taken by two Ukrainian policemen in dark blue uniforms with rifles for forced labor. He said that in the process of his recruitment for this work he was beaten and pushed by them [N.T. 6–20, 21]. He stated that they approached him and told him, "You are going with us" [N.T. 6–20]. During his work assignment, Weinfeld testified that he was guarded by Ukrainian police while he was forced to do road construction work outside the town of Rawa Ruska [N.T. 6–23]. During the work, he said they screamed at him and beat him with whips

[N.T. 6–23, 24]. The work he was forced to do included the breaking up of tombstones from a hundred-year-old Jewish cemetery for use as a foundation for a road. Weinfeld said that in the process of doing this heavy work he became injured and disabled and could not walk at the time [N.T. 6–20 to 25; see also N.T. 6–85].

 Kurt Lewin testified that he also participated in that same work assignment at the Jewish cemetery during which he was guarded by Ukrainian police [N.T. 4–94 to 95]. Soviet videotape witness [22] Or-

21. Aside from the other grounds mentioned at n. 18 supra, Osidach attempts to attack the credibility of Abraham Weinfeld because he allegedly could not describe the Ukrainian police uniform, nor did he know what a "trident" was nor could he describe it. While it is true that Weinfeld could not remember such minute details of the Ukrainian uniform (i.e., caps, visors, insignias, belts, bayonets) [N.T. 6–45 to 46], he could describe other significant features of the uniform, which convinces the Court that he was in fact describing the same uniform worn by the Ukrainian police in the town of Rawa Ruska to which numerous other witnesses, including Osidach, also testified. Weinfeld stated that the Ukrainian police involved in the activities he testified to wore "dark blue navy" uniforms which were a different color from the gray-green German uniforms [N.T. 6–32, 29], and they carried weapons [N.T. 6–20, 29, 47]. He stated that the uniforms had brass-gold buttons and the Ukrainian police wore boots [N.T. 6–26].

22. During the course of this litigation, Osidach raised several objections to the videotape depositions of witnesses residing in the Soviet Union. Those objections are based on principally three areas. First, Osidach objected to the depositions being taken in the Soviet Union at all. Second, he objected to the oath taken at the depositions as not conforming to Fed.R.Civ.P. 26; and, finally, he objected to the presence of Soviet procurators, their version of our prosecutor, at the depositions.

First, the Court previously overruled Osidach's objection regarding the taking of the depositions generally in the Soviet Union because there is no ground known to the Court for barring the admission into evidence of depositions taken on foreign soil provided they are admissible under the Federal Rules of Civil Procedure and the Court finds they are so admissible. See Fed.R.Civ.P. 28(b); 8 Wright & Miller, Federal Practice and Procedure—Civil, § 2083 (1970).

Second, Osidach's objection as to the presence of the Soviet procurators at the deposi-

tions falls within Fed.R.Civ.P. 26(c)(5). Under that rule, a court may enter an order that discovery be conducted with only those persons present as designated by the court. The rule has normally been applied in cases of confidential information being disclosed at depositions. That was not present here, since the witnesses were subject to interviews by the Soviet procurators prior to their video depositions. See Metal Foil Products Manuf. Co. v. Reynolds Metals Co., Inc., 55 F.R.D. 491 (E.D. Va.1970). See also 8 Wright & Miller, supra, § 2041 at 296. The rule has also arisen when the examination of witnesses will be more effective when other persons are not present, usually other witnesses. See Dunlap v. Reading Co., 30 F.R.D. 129, 131–132 (E.D.Pa.1962). In the instant case, the Court was faced with a balance of factors. On the one hand, the Court believed that a real condition imposed upon the United States Government by the government of the Soviet Union was that, to have the precedential depositions taken at all, the Soviet procurators had to be present at such depositions. This realistic factor was balanced against Osidach's request that the procurators not be present at all. Therefore, the Court found, in the balance, that the procurring of videotaped deposition testimony of Soviet eyewitnesses outweighed the concerns expressed by Osidach. At trial, when viewing and reading the depositions of the Soviet witnesses, the Court saw no negative impediment by the Soviet personnel who were present at the depositions to the testimony of the witnesses; nor was the Court informed of any specific impediment by defense counsel at trial. The involvement of the Soviet procurators in the depositions was virtually nonexistent and, in those instances when it appeared to the Court in any way that the rare interjection by a Soviet procurator was inappropriate and might have impeded the witness' testimony, Osidach's objection was sustained.

Third, as to the issue of the oath administered to the Soviet witnesses, the Court understands that the Soviet legal system does not

est Strazhnik,[23] a Ukrainian, testified that he observed Jews working outside the ghetto placing stones for roads while guarded by armed Ukrainian police in dark blue uniforms [dep. at 20–22]. Finally, witness Altshuler stated that at the time near the final action about 100 Jews, including himself, were taken outside the town under guard by the S.S. and armed Ukrainian police in dark blue uniforms to "an old cemetery" where the able-bodied Jewish males were selected by the S.S., in the presence of the Ukrainian police, for forced labor. The other Jews, including women and children, were taken away toward the direction of a forest outside the town with armed Ukrainian police stationed in the back of the trucks. One of those taken away was his mother, whom he never saw again [N.T. 6–128 to 131]. *See also* Ex. P–6, Rayon Commission Report at 2, testimony of M. Gokh ("[o]n December 10, 1942. . . . They [S.S. and Ukrainian police] gathered the Jewish population together at an assembly point, where they selected the healthy for work and put the rest—that is

women, old people, and children—in trucks and took them to the Sedlysk Forest and there shot them.").

(ii-c) *Ukrainian Police Used in the Deportation of Jews From the Ghetto*

Philip Langer testified that during July of 1942 an action occurred during which he observed Germans and armed Ukrainian police wearing dark blue uniforms surrounding the ghetto, seizing Jews off the streets and from their houses, placing them in trucks and taking them away. This he said occurred throughout the day [N.T. 4–112 to 114]. On another occasion, he personally was forceably seized by a Ukrainian policeman and taken away with others by truck to the railway station where, under the guard of armed Ukrainian policemen and Germans, some people were selected by the Germans and placed in railway cars. Others like himself were taken away to a labor camp outside of town [N.T. 4–118 to 120]. During the first action, Langer saw truckloads of Jews being taken to the railway station guarded by Ukrainian police and

permit the use of an oath swearing to tell the truth of the type used in United States courts. However, a review of the oath given to the deponents at the Soviet depositions, together with a review by the Court of the manner in which it was given and the responses of the deponents, convinces the Court that the Soviet oath given satisfies all of the requirements of the Federal Rules of Civil Procedure. In that regard, the deponents clearly understood that they were required to tell the truth. In fact, when one witness on cross-examination was asked:

Q Does Mr. Bakai know the meaning of the word perjury?
A Yes, he understands it quite well.
Q What does it mean?

\* \* \* \* \* \*

THE WITNESS: A jail if I tell false—or if I give false evidences.
S.D. Bakai dep. at 63.

Furthermore, Osidach objects in general to portions of the translations provided by the Soviet-supplied interpreters at the depositions. While defense counsel was accompanied in the Soviet Union with his own designated interpreter who was present at all depositions, the Court has chosen out of an abundance of caution to disregard any particular portions of the video depositions in which a question exists through objections of defense counsel and,

therefore, those objections have been sustained.

Finally, as a further precautionary step, the Court has as a general matter throughout its findings of fact only credited and relied upon any testimony of Soviet videotape deposed witnesses where the factual matter to which they testified has been corroborated by the testimony of an eyewitness who appeared at trial or by other uncontradicted documentary evidence, or Osidach's own testimony. The Court would like to note that it appears that Osidach's belief as to the general lack of trustworthiness of the Soviet videotape witnesses is not without equivocation because Osidach introduced into evidence at trial the depositions of two other videotape Soviet witnesses that the Government did not offer in its own case. *See* S. D. Bakai dep.; V. O. Ostap dep.

**23.** Osidach challenges the testimony of witness Strazhnik in general because the witness was only 10 years old at the time the events he testified to occurred. The Court is cognizant of the testimonial difficulties often inherent in childhood memories. However, the witness here was subject to vigorous cross-examination by defense counsel as to those factual events, which the Court believes were very impressionable, personal and in some instances historical events, and the witness consistently adhered to his testimony on direct and cross-examination.

Germans [N.T. 4–111 to 112; *see also* Kulikovska dep.[24] at 29–34; Banakh dep.[25] at 32–37]. Kurt Lewin also testified that he saw armed Ukrainian police with dark blue uniforms, both alone and with Germans, removing Jewish citizens from their homes throughout Rawa Ruska and leading them to the railway station and there loading them into "cattle cars" and "shipped we didn't know where" [N.T. 4–88 to 92].

(ii-d) *Activities of the Ukrainian Police in the Final Action Involving the Liquidation of the Rawa Ruska Ghetto*

Several witnesses testified that, during the activities constituting the final action, Ukrainian policemen assisted the Germans by searching hiding places for Jews [N.T. 6–127 to 128; *see also* Ex. P–2 at 11]. The Weinfelds both testified as to the final liquidation during which they viewed Ukrainian police in dark blue uniforms assisting the Germans in searching homes in the ghetto and "pulling out people, children, older people, whoever they saw, whoever was Jewish..." [N.T. 6–31 to 33, 93, 95; *see also* Strazhnik dep. at 28–32; Kulikovska dep. at 40–41].

Finally, Anna Weinfeld testified:

All of a sudden, I heard some shooting and crying. I went to the window. I saw, like, after a big storm, the block was running. And then I saw some people picking up Jewish children by the feet and banging their heads to the wall.

\* \* \* \* \* \*

Q These people you have just described—

\* \* \* \* \* \*

Q —doing these things—

A They were German and Ukrainian police.

N.T. 6–94, 95. *See* Ex. P–6 at 2 (Gokh), 4.

(c) *Osidach's Version of the Role of the Ukrainian Police in the Town of Rawa Ruska From 1942 to 1944*

During his pretrial and trial testimony, Osidach painted a much different picture of the role of the Ukrainian police in the town of Rawa Ruska from 1942 to 1944 than that offered through the overwhelming and credible testimony of the Government's witnesses and other evidence.

Osidach testified that the Ukrainian police in the town of Rawa Ruska during the German occupation period *only* enforced the laws applicable to the Ukrainian and Polish people and had the duty of keeping order in the streets of Rawa Ruska on a daily basis [N.T. 3–16; dep. 2 at 43–44, 61]. Their work included dealing with traffic problems created in front of the Ukrainian food store in the town and guarding packages arriving at the town post office [N.T. 3–16; dep. 2 at 43–44]. Osidach stated that the Ukrainian police did not enforce the special laws applicable to the Jews in Rawa Ruska [N.T. 3–21, 23, 27; dep. 2 at 60, 61], and they were not even allowed to arrest Jews within the town [dep. 2 at 69, 70]. The Ukrainian police, Osidach asserted, never assisted in guarding Jews within the ghetto, because they were forbidden by the Germans from entering the ghetto under penalty of arrest [dep. 2 at 50]; nor were the Ukrainian police involved in any activities surrounding the final liquidation of the ghetto, including the searching for Jews [N.T. 3–46, 51; dep. 2 at 52–53]. Finally, Osidach stated that the Ukrainian police never guarded Jews engaged in forced labor [N.T. 3–33; dep. 2 at 69]; nor did they guard Jews on the way

24. Osidach objects to the testimony of witness Kulikovska as not being credible because she said she never saw the Ukrainian police fire a weapon [dep. at 79]. The Court notes that she also stated that, "I haven't seen because they didn't use it openly.... So, the people were not executed in the presence of all citizens." [dep. at 79]. Furthermore, as fully discussed later, *see infra* 98–100, acts of persecution can take a variety of diabolical forms, including physical and mental forms. Murdering innocent civilians by shooting them is certainly not the only form of persecution; many others to which the Ukrainian police were participants have been clearly described above.

25. Osidach also challenges the testimony of witness Banakh because he stated that he never saw a Ukrainian policeman fire a rifle. The Court's response at *supra* n. 24 is equally applicable to that assertion.

to the Rawa Ruska railway station [N.T. 3–30; dep. 2 at 65].

Osidach offers the defense that it was not the Ukrainian police that assisted the Germans in enforcing the special laws applicable to the Jews, arresting Jews for violations of those laws [dep. 2 at 69–70], guarding Jews in the ghetto [dep. 2 at 70], recruiting and guarding Jews used for forced labor on road crews [dep. 2 at 70, 59]. Rather, Osidach contends that all of these acts of assistance were performed by the specially created Jewish order police—the so-called Judenrat.

The Court finds after carefully reviewing and assessing the in-court testimony of Osidach and reading his deposition testimony, that his version of the role played by the Ukrainian police in the town of Rawa Ruska is not credible or believable and is totally contrary to substantial and credible eyewitness testimony and corroborating documentary and expert evidence. Furthermore, in simplest terms, Osidach's version is completely at odds with the realities of life in Rawa Ruska existing during the German occupation.[26]

There are two major weaknesses in his version of the role of the Ukrainian police. Both can be proven solely by Osidach's own statements during his pretrial deposition and trial testimony.

(i) *Administrative Necessity*

It is undisputed that the population of the town of Rawa Ruska in 1941 was between approximately 10,000 to 11,000, of whom approximately one-half or 5,000 were Jewish. It is also undisputed that from 1942 to 1943 Jews from surrounding areas outside of Rawa Ruska were transported to the Rawa Ruska ghetto, thereby further increasing significantly the number of Jewish civilians within the town ghetto. In that regard, Philip Langer testified that when he left Rawa Ruska in October of 1942 there were approximately 10 to 12 thousand Jews still remaining in the ghetto [N.T. 4–98]. Although from 1942 to 1943 the various actions within the ghetto tragically decreased the population of the ghetto, it would be fair to say that between 1941 and 1943 there were at any one time several thousand Jews within the Rawa Ruska ghetto subject to its many dehumanizing and oppressive laws and the object of numerous acts of persecution as part of the German plan of ultimate destruction of the ghetto and its inhabitants.

Based on those statistical estimates, Osidach testified as to the following: He stated that at any one time from 1941 to 1944 there were never more than *eight* Ukrainian police within the town of Rawa Ruska [dep. 2 at 63; *see also* M. Lunik dep. at 64]. He also testified that although he does not remember exactly how many German police, including city police, schultz police and S.S., there were within the town at any given time there "weren't many" [dep. 2 at 63]. Finally, Osidach testified that only a Ukrainian police force existed in the town

26. The Court also finds as a general finding that the overall testimony of Osidach should not be entitled to great weight in light of his prior repeated misstatements under oath during his depositions, at trial and before the IRO.

In 1964, when he was interviewed by the INS, Osidach stated under oath that he worked from 1941 to 1944 in a dairy in Rawa Ruska [Ex. P–26 at 3]. He denied being a Ukrainian policeman at that time except for doing some interpreting work for them [Ex. P–26 at 4]. In a 1976 sworn statement to the INS, Osidach claimed again that he only worked during the war in a dairy and denied being a uniformed member of the Ukrainian police [Ex. P–27 at 2, 3, 4]. He also denied carrying a weapon at that time [Ex. P–27 at 4]. In contradiction of these prior statements, Osidach stated at his pretrial deposition and at trial that he had not worked in a dairy from 1942 to 1945 [N.T. 2–162 to 164; dep. 2 at 85–86]. He admitted he had been a uniformed Ukrainian policeman during that time and did more than interpreting work [N.T. 3–11 to 16, 45, 45; dep. 2 at 60, 72, 73, 75]. He also indicated that he carried a pistol [N.T. 3–4, 16 to 18, 44; dep. 2 at 44, 45, 61]. He admitted that he made misstatements in the prior INS depositions [dep. 2 at 86–90]. He further admitted that he had lied to the IRO in 1949 about his occupation during the war in Ex. P–17 [N.T. 3–57 to 58; dep. 2 at 92, 93].

These selected examples serve to undermine the overall credibility of Osidach's deposition and trial testimony, including his statement about his version of the role of the Ukrainian police and the Judenrat.

of Rawa Ruska during the German occupation period with no other non-German ethnic-composed police present [dep. 2 at 61, 80].

The Court will take judicial notice of the historical fact that, throughout the 1942 to 1945 period, Germany was also at war with the Soviet Union and engaged in massive military operations involving hundreds of thousands of military personnel and obviously placing a higher priority for the deployment of German personnel on the battlefield than in carrying out rear-guard civilian control in occupied areas.

The Court, therefore, fully concurs with the expert opinion of Dr. Hilberg that it would have been "inconceivable," based on reasons of administrative necessity, for the Germans to not have depended on the Ukrainian police in the town of Rawa Ruska, as they had throughout the Galacia region, in carrying out their plan to assemble, imprison in the ghetto, force into labor, guard and transport to Belzec and elsewhere thousands of Jews [N.T. 1–117]. It would be totally unreasonable to infer from all of this that only a minor contingent of German police, S.S. and Gestapo could have by themselves carried out these deeds to which numerous witnesses have testified, including Osidach.

Osidach has asserted in response to this compelling conclusion that, while it is true the Germans could not have instituted and implemented their acts of persecution alone, they were assisted not by the Ukrainian police but by the "Jewish order police."

### (ii) *The Jewish Order Police*

The Jewish order police were drawn from the same persons whom the Germans intended to exterminate throughout Europe so that eventually the world would be "Jew free," without exception. The Jewish police, Osidach stated, did not carry weapons but only large sticks and were not uniformed [dep. 2 at 70]. These are the same Jewish police that Osidach alleges were involved in duties that took them outside the ghetto and often outside the town itself to work sites guarding fellow Jews [dep. 2 at 59, 69–70].

The status of the Jewish police must be compared with that of the Ukrainian police in Rawa Ruska. Osidach admits that the Ukrainian police, whom the Germans allegedly "did not trust" were organized [N.T. 2–171; dep. 2 at 15]; many were trained over a three-month period in "military training" to "keep order in the city" and to enforce the laws of Rawa Ruska "to apply to the people" [dep. 2 at 36, 37, 38; N.T. 2–172 to 176]; were supervised [dep. 2 at 18, 41, 72–73]; paid [dep. 2 at 24]; and, given uniforms and uniform allowances [dep. 2 at 24, 29–31]—*all* by the Germans. Furthermore, the Germans supplied the weapons and taught the Ukrainian police, including Osidach, how to use them, which they freely were authorized and expected to carry and display daily on the streets of Rawa Ruska [N.T. 2–173, 174; 3–4, 20; dep. 2 at 36, 37, 42, 43, 44, 61, 62]. Finally, the Ukrainian police were engaged by the Germans as a full-time contingent force whose activities required their daily deployment on the streets of the town [N.T. 3–16, 18; dep. 2 at 43, 44, 45]. Revealingly, Osidach corrected the record by stating that the name was not really Ukrainian police but Ukrainian "hiffspolizer," which he translated to mean "Ukrainian helping police or auxiliary helpers" [dep. 2 at 41; *see also* N.T. 4–80 to 82]. Osidach stated that the Ukrainian police were "depended on" by the German gendarmes [dep. 2 at 72–73]. These were the same German gendarmes that he stated guarded Jews going to and at the Rawa Ruska railway station, participated in the actions and generally enforced the laws applicable to the Jews [N.T. 3–28, 30; dep. 2 at 65].

Finally, the Ukrainian police, Osidach testified, were "only to help Ukrainian people" because if the Polish police had been in charge it would have been "very bad for the Ukrainian population" in Rawa Ruska [dep. 2 at 80; *see also* N.T. 2–163]. In that vein, Osidach described WW II as a war between Poland and Germany [dep. 2 at 56]. Osidach, as a member of the OUN, had admittedly been arrested by the Poles for his

nationalist activities. WW II was also a war between the Soviets and Germans. Osidach was chosen as commandant of the Ukrainian militia precisely because he was a nationalist Ukrainian [N.T. 2–163]. Osidach admits that he was fleeing from the Soviets when he left Rawa Ruska in 1944 [Ex. P–27 at 8]. Therefore, one further revealing factor is that the Ukrainian police, composed exclusively of Ukrainians [N.T. 2–171], and the Germans shared common enemies during WW II—the Poles and the Soviets.[27]

Osidach has referred the Court to the testimony of three witnesses which he claims support his contention that the Jewish order police, and not the Ukrainian police, assisted the Germans in acts of persecution against civilians. All these witnesses were Soviet videotape witnesses, which raises the evidentiary difficulties Osidach has so forcefully raised before. *See* n. 22 *supra.*

S. D. Bakai testified that he saw Jewish police with sticks escorting Jewish laborers to their jobs on the streets of Rawa Ruska [dep. at 67]. Bakai also stated that the Ukrainian police guarded "all people" in the town of Rawa Ruska [dep. at 63]. Furthermore, when asked whether the Jewish police carried weapons, he candidly stated, "Who would give a Jew a rifle?" [dep. at 67].

Witness I. P. Vitko testified that the Jewish police guarded the entry road to the ghetto [dep. at 16]. Osidach also objects in his findings of fact that Vitko's deposition demonstrates the interpretation problem occurring throughout the Soviet videotape depositions, at ¶ 39. Vasil O. Ostap testified that he saw Jews performing labor outside the ghetto and they were guarded by Germans and Jewish police [dep. at 17–18, 20, 22]. Later, when the witness was asked whether he remembered anyone else

guarding those same he stated, "I can't recollect this. Probably they [Ukrainian police] were there. Because it was just next to the police station, Ukrainian police station." [dep. at 19].

The point that must be made, in light of Osidach's defense, is that there is no dispute based upon the testimony of the Government's own witnesses that a Jewish order police (Judenrat) actually existed in the town of Rawa Ruska from 1941 to 1943 [*see* N.T. 4–104 to 108, 147–149; 6–54, 55, 108, 109, 125]. There is also no dispute that the Jewish order police were ordered by the Germans to perform certain duties including the recruitment of Jewish laborers in the ghetto [N.T. 4–104 to 108, 147 to 149].

That, however, does not in itself support Osidach's defense, because the question is really not whether the Jewish police assisted the Germans in persecuting civilians, but whether the Ukrainian police *also* assisted the Germans in those same acts. Not one witness to which the defendant refers testified that the Jewish police assisted the Germans and the Ukrainian police did not.

In that regard, the Court finds the testimony of Philip Langer particularly compelling in showing the apparent tripartite structure that existed in Rawa Ruska from 1941 to 1943 between the Germans, the Ukrainian police and the Jewish police. He testified:

Q After the Germans came into Rawa Ruska, how were you employed?

A Well, I was taken to work for—first they organized a Judenrat.

Q O.K.

A And that Judenrat was like a sort of put-up committee from the Jewish people.

Q Who organized this Judenrat?

A The Germans.

---

27. Osidach's final assertion that Ukrainian police did not assist the Germans in the final liquidation action but, rather, they were assisted by a specially recruited group of Kalmyk-Mongols dressed in similar dark blue uniforms [dep. 2 at 52–53], even if true—which is totally unsupported and not credited by the Court—is irrelevant because the evidence shows that the Ukrainian police also assisted the Germans in other acts of persecution, aside from the particular activities involving the final liquidation, which in and of themselves are sufficient to constitute acts of persecution under § 13.

Q O.K. And what relation did this JUdenrat [sic] have to the work which you did?

A Then they come there, they come and took the people to work.

Q Were you taken to work?

A Yes, sir.

\* \* \* \* \* \*

Q Was the group of workers under guard?

A Yes, sir.

Q Do you know by whom they were guarded?

\* \* \* \* \* \*

THE COURT: Was there anyone guarding those who were doing this work?

THE WITNESS: Yes, sir.

THE COURT: Who was that?

THE WITNESS: It was from the Militia.

THE COURT: The Militia?

THE WITNESS: The Militia.

THE COURT: How did you know this? How could you tell this?

THE WITNESS: Because they had uniforms and they had weapons.

THE COURT: Go ahead.

BY MR. MOSCOVITZ:

Q What color were the uniforms, Mr. Langer?

A Dark blue.

Q When you say "Militia," which Militia are you referring to?

A There was only one Militia, the Ukrainians.

Q Ukrainian Militia?

\* \* \* \* \* \*

Q Now, you indicated that the work was assigned to you through the Judenrat; is that correct?

A It was assigned. The Germans came into the Judenrat and they said, "We need 10 or 20 or X amount of people." So by then if the Judenrat didn't go ahead and assign people they went ahead in the streets and picked anybody in the streets, whoever wore the Jewish mark.

Q Who would go out on the streets and pick the people up?

A The Militia with the Germans.

Q Did you ever actually see people taken off the streets to work?

A Yes, sir. I myself was taken off once.

Q By whom were you taken? Just a second. By whom were you taken off the streets?

A Militia and the Germans.

\* \* \* \* \* \*

Q Mr. Langer, was there a Ukrainian police in Rawa Ruska?

A The Militia and the police are the same. There was only one.

N.T. 4–105, 106, 107 to 109.

Therefore, the total evidentiary picture—consisting of the credible and overwhelming testimony of the Government's witnesses supporting the documentary, expert and circumstantial proof—convinces the Court that, no matter what role the Jewish police played, if any, the Ukrainian police also constituted a movement which assisted the Germans in the persecution of civilians in the town of Rawa Ruska from 1942 to 1943. As such, the Ukrainian police constituted a proscribed movement under § 13 of the DPA.

(iii) *Defendant Osidach's Role as a Willing Member of the Ukrainian Police in the Town of Rawa Ruska From 1942 to 1944*

Having found that the Ukrainian police in Rawa Ruska from 1942 to 1944 constituted a movement that assisted the Germans in their policy of persecution of civilians under § 13 of the DPA, it is necessary to determine under the plain language of § 13 whether Osidach was a willing member of that movement during that period.

Osidach admits that in 1941 he voluntarily and willingly trained for three months in the City of Lvov, Poland, as a Ukrainian policeman; that his training was conducted under the supervision of Ukrainian, Polish and German instructors; and, that he was trained along with other Ukrainians recruited and selected from throughout the

Galacia region in "military training," including instruction in the use of firearms [N.T. 2–171 to 175, 180; dep. 2 at 18–20, 36, 37].

At the completion of his training, Osidach was provided with a loaded pistol and the dark blue uniform of the Ukrainian police [N.T. 3–3, 4; dep. 2 at 20, 25, 42–43]. As a Ukrainian policeman, he admittedly had two separate full-time duties for which he was paid [N.T. 3–16; dep. 2 at 24, 25, 45, 71]. First, he worked as an interpreter/clerk for the Ukrainian police and the German gendarmes in the town [N.T. 2–177, 180, 181; 3–10 to 15, 45, 48; dep. 2 at 72–76; Ex. P–26 at 3; Ex. P–27 at 5, 6]. Second, he functioned as a street policeman in the town [N.T. 3–16, 20, 44, 45; dep. 2 at 42–46, 49, 70]. In both duties that were undertaken between 1942 and 1944, Osidach wore the dark blue uniform of the Ukrainian police, carried a loaded pistol in a holster at his side, wore the emblem of the Ukrainian police, was viewed in public on the streets of the town daily in that regalia and was identified by the citizens of the town and manned his post as a member of the Ukrainian police [N.T. 2–177 to 180; 3–3, 4, 16–18, 20–21, 44; dep. 2 at 42–45, 46, 49, 61, 73].

Osidach's complete involvement in and willingness to serve as a part of the Ukrainian police unit was further exemplified by the undisputed fact that, during a part of the time he served as a Ukrainian policeman, he held the rank of hauptwachman, which he understood to be of a higher rank than a simple policeman—a wachman [N.T. 2–183; 3–5, 18, 19, 20, 44, 51, 104, 105; dep. 2 at 28, 44, 46, 47; Ex. P–7, 9; see also N.T. 4–131 to 132]. Osidach was elevated to that position, he claims, because of his superior educational background [N.T. 3–19; dep. 2 at 28]. He testified that in this position of hauptwachman he gave orders to lower-ranked wachman [N.T. 2–183; 3–20, 43, 44, 51, 104, 105; dep. 2 at 28, 44, 46, 47, 62, 63]. He received his orders from superiors and he transmitted those orders to the lower wachman because he had no authority to give them on his own [N.T. 3–104, 105]. There is no evidence to suggest that this was done involuntarily or unwillingly.

On that point, Daniel Segat of the IRO testified that voluntariness of membership was an important factor and that it was irrelevant whether a member was an enlisted man or an officer [dep. at 31]. Segat testified that he knew of cases where involuntariness had been claimed but eligibility was nevertheless denied because the persons making those claims were officers, which, he said, dispelled any notions of the involuntariness of their service [dep. at 76].

Based on this undisputed credible evidence, the Court finds that "clearly and unequivocally" and "without doubt" Osidach was a voluntary and willing member of the Ukrainian police in the town of Rawa Ruska from 1942 to 1944. Accordingly, under the first prong of § 13 of the DPA, he was ineligible to enter this country in 1949 as a displaced person.

(iv) *Osidach as a Participant Under § 13*

■ Having found that Osidach was a willing member of the Ukrainian police in the town of Rawa Ruska under the first prong of § 13, the Court also finds that his war-time service classifies him as a participant in acts of persecution under the second prong of § 13. In that regard, the Court adopts the standards for participation as set forth in the *Fedorenko* decision by the Supreme Court.

In *Fedorenko*, the factors upon which the Supreme Court relied in finding that the defendant had been a participant in committing acts of persecution against concentration camp inmates were as follows:

The solution to the problem perceived by the District Court, see n.32, *supra*, lies, not in "interpreting" the Act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in the *persecution* of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. *On the other hand, there can*

*be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.* Other cases may present more difficult line-drawing problems but we need decide only this case.

—— U.S. —— n.34, 101 S.Ct. 750 n.34 (emphasis supplied). *See also* —— U.S. —— n.35, 101 S.Ct. 751 n.35.

Here, Osidach was "issued a uniform and armed with a . . . pistol," "paid a stipend," had freedom of movement in the sense that although his work was full-time he had certain days off to himself [N.T. 2–177 to 180; 3–3, 4, 16–18, 21, 44; dep. 2 at 20, 24, 25, 42–45, 46, 49, 61, 73]. The Court does not find that the present record supports a finding, as it did in *Fedorenko*, that Osidach here personally committed specific physical acts of atrocity against any civilian of the type discussed in *Fedorenko* (*i. e.*, shooting at fleeing inmates).[28] But the *Fedorenko* Court stated that what constitutes acts of persecution is not limited to those factors delineated in that decision because "[o]ther cases may present more difficult line-drawing problems. . . ." —— U.S. —— n.34, 101 S.Ct. 750 n.34.

From that viewpoint, the Court finds that Osidach was a participant in acts of persecution under § 13 based upon two separate activities in which he was admittedly engaged in the town of Rawa Ruska from 1942 to 1944.

Osidach admitted that his role as a Ukrainian policeman consisted of two basic duties [N.T. 3–16; dep. 2 at 45]. One was

as a street policeman daily patrolling the streets of Rawa Ruska [N.T. 3–16 to 18; dep. 2 at 42–43]; and, second, as an interpreter for both the Ukrainian police and the German gendarmes in the town of Rawa Ruska from 1942 to 1944 [N.T. 2–177; 3–11, 14–15, 45; dep. 2 at 71–76; Ex. P–26 at 3; Ex. P–27 at 5, 7]. Osidach told us that part of his work as an interpreter for both groups involved translating for interrogated suspects as follows:

Q. Approximately how many times did you interpret for the police at the City Hall?

A. Oh a couple of hours, one day each week, for about two years, 1941–1942.

Q. What was the nature of the business or conversations which you had to interpret or translate at City Hall?

A. It was all kinds of business. In those days the Germans set up a quota for farmers to deliver to the government, they may not make it all the time and were called in to the police. I also used to interpret for the police when people were arrested or suspected as being communists, I was called in.

Q. Were any of those people that you interpreted for eventually arrested and sent to the ghetto?

A. I don't think so but I never knew what happened after I interpreted.

Ex. P–26 at 3.

Q. Did you ever accompany the police or the Germans while they went out to make an arrest or an apprehension?

A. No, not when they arrested, but sometimes at the hearings.

Q. Were any of these people who you interpreted for Jews?

28. The Court does not find that the present record supports a finding under the applicable burden of proof that Osidach engaged in any acts of physical and mental persecution other than those discussed herein. The Government's evidence in that particular regard was either: equivocal in light of Osidach's admitted role and activities as a Ukrainian policeman

[N.T. 3–124 to 126 (Rybitwer); Strazhnik dep. at 29–32]; concerned events only observed for an isolated instance under extremely stressful circumstances [N.T. 4–132 to 134 (Langer)]; or, constituted the limited observations of only one witness unsupported by other evidence [S.D. Bakai dep. at 21, 26–27].

A. Could be Jews, but mostly they were Ukrainians, but I was interpreter for Ukrainian language, from Ukrainian to German.

Ex. P–27 at 7. *See also* N.T. 3–14 to 15; dep. 2 at 72.

Osidach testified that he served as the "main interpreter" for the Ukrainian police [dep. 2 at 73], and that during his duties as an interpreter he carried a loaded pistol at his side [N.T. 2–177; dep. 2 at 73].

This work was done first for the German gendarmes in Rawa Ruska whom Osidach stated took part in the actions in the ghetto [Ex. P–26 at 6]; took and guarded Jews at the Rawa Ruska railroad station [N.T. 3–30]; and, generally enforced the laws of Rawa Ruska as formulated by the conquerors and then applied to the Jewish population [N.T. 3–28]. He understood the German gendarmes "depended on" the Ukrainian police [dep. 2 at 72–73]. Osidach also stated that, "Basically I was interpreter for and translator for gendarmerie." [N.T. 3–45].

The other group that Osidach admits interpreting for, as its main interpreter, was the Ukrainian police whose persecutive activities as a movement in the town of Rawa Ruska have already been thoroughly outlined. In that role, he stated that he personally interpreted regularly for the commander of the Ukrainian police for the entire Rawa Ruska region, which included the town of Rawa Ruska [N.T. 3–10, 11; dep. 2 at 72–76].

Based on that evidence, Osidach's role as an interpreter is far different from the example the *Fedorenko* Court provided of the somewhat noncontroversial and passive act of inmates cutting the hair of fellow inmates and, hence, not constituting acts of persecution. —— U.S. —— n.34, 101 S.Ct. 750 n.34. In contrast, the Court finds here that Osidach's role as a full-time, paid and armed interpreter for both the German gendarmes and the Ukrainian police made him a necessary link between the Germans and the objects of their persecution—the Jews in the town of Rawa Ruska—from 1942 to 1944. His ability to translate three separate languages (Ukrainian, Polish and German [N.T. 3–11, 67]), in a multilingual German-occupied area was obviously a vital skill he delivered to the Germans, who at that very time were carrying forward their occupation policies. *See* Segat dep. at 32.

Second, the Court finds that the additional admitted role of Osidach as a full-time, paid, dark-blue uniformed and armed Ukrainian policeman, who manned his post daily on the streets of Rawa Ruska, also constituted participation in acts of mental persecution against civilians in that town [N.T. 3–3, 4, 16–18, 20, 21; dep. 2 at 16–20, 42–46, 49]. Persecution can be either physical or mental, or both. Under the laws concerning the deportation of illegal aliens, the following statutory provision exists:

(h) The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

8 U.S.C. § 1253(h). The importance of this in this case is that Congress, in enacting that provision, stated in House Report 745 that "[t]echniques of persecution are not limited to bodily violence alone." H.R. Rep.No. 745, 89th Cong., 1st Sess. 22 (1965). Similarly, during the legislative debates of that provision, the following statement was made on the House floor:

Tyranny over the mind and spirit of a person has been demonstrated as more fearsome than the ancient methods of torture which characterized the Communist takeover of many countries of Central and East Europe.

111 Cong.Rec. 21586 (1965) (remarks of Rep. Feighan), relied upon in *Kovac v. Immigration and Naturalization Service*, 407 F.2d 102, 106 n.9 (9th Cir. 1969).

Section 1253(h), as originally enacted, only spoke of "physical persecution," which was defined by the Court of Appeals for the Third Circuit as:

The phrase "physical persecution" should be taken to mean confinement, torture or death inflicted on account of race, religion, or political viewpoint.

*Blazina v. Bouchard,* 286 F.2d 507, 511 (3d Cir. 1961).

In discussing the amended version of § 1253(h), the Ninth Circuit Court of Appeals held in *Kovac, supra,* that:

No doubt "persecution" is too strong a word to be satisfied by proof of the likelihood of minor disadvantage or trivial inconvenience. But there is nothing to indicate that Congress intended section 243(h) to encompass any less than the word "persecution" ordinarily conveys— the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive. *See* Webster's Third New International Dictionary 1685 (1965).

407 F.2d at 107.

The instant case presents acts of mental as well as physical persecution. Osidach's role as an armed, uniformed interpreter for either the Ukrainian police's or the German gendarmes' interrogation of suspects could be classified as both physical and mental persecution. Osidach's personal assignment as an armed, uniformed Ukrainian street policeman constitutes on the present record the form of mental persecution that quite naturally follows from the conspicuous public display of armed force and uniformed authority, regularly, over a long period of time in a repressive ghetto-type atmosphere. The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities, physical abuse, injuries or even death, without notice or reason, is the personification of mental persecution, to anyone, let alone innocent civilian men, women and children reduced to various degrees of substandard mental and physical well-being.

The presence of the Ukrainian police on the streets of the town was dramatically testified to at the trial as follows:

I was afraid to look at them [Ukrainian police] to be truthful with you and honest. I was afraid to go close to them to look at them. Even when he [Ukrainian policeman] grabbed me, I was afraid to look at him.

N.T. 4–141 (Langer).

A Oh, yes, I seen them practically every day.

Q On the streets?

A On the streets. When they walked in the streets we tried to sneak away like a mouse.

N.T. 4–116 (Langer).

. . . Any Militia [Ukrainian police] had a free hand. If a Militia decided to take, say, my kid or my brother's kid and just take him and beat him to death or take him and throw him anywheres [*sic*] he felt like it, he could have done it and the same as the Germans could have done that, too.

N.T. 4–160 to 161 (Langer).

A When I saw them daily, they were part and parcel of the life in Rawa Ruska.

Q These policemen?

A In the process of this mass of life and death.

N.T. 4–91 (Lewin). *See also* N.T. 4–84.

Osidach's testimony buttresses this notion when he said that, while performing their duties on the streets of Rawa Ruska, the Ukrainian police wore their uniforms because the people of the town "had respect to the uniform" [dep. 2 at 42]. It is a common truism that one person's "respect" is another person's fear.

In conclusion, the Court finds that, under § 13 of the DPA, Osidach was ineligible to enter this country in 1949 as a displaced person because of, first, his willing membership in the Ukrainian police, which was a movement under § 13 that assisted the Germans in persecuting civilians during WW II and, second, because he was a participant affiliated with the Ukrainian police who personally committed acts of persecution both in his role as an interpreter for the Ukrainian police and the Germans and in

his capacity as a Ukrainian street policeman in the town of Rawa Ruska from 1942 to 1944.

■ Finding Osidach, as a matter of law, ineligible as a displaced person under the DPA, his 1949 entry visa was invalid under § 13 and his entrance into this country in that year was illegal since it was not based upon a valid unexpired immigration visa required at that time. Immigration and Nationality Act of 1924, ch. 190, § 13(a), 43 Stat. 153, 161 (repealed 1952). *See also Fedorenko, supra,* —— U.S. ——, 101 S.Ct. 751 (and cases cited therein). *Accord* 8 U.S.C. § 1181(a) (current enactment). As such, Osidach could not have been a legal resident of the United States for five years prior to his application for citizenship in 1963 because he was never legally admitted to the United States. 8 U.S.C. §§ 1427(a), 1429.

Therefore, as succinctly stated by the Supreme Court in *Fedorenko*:

Accordingly, inasmuch as petitioner fails to satisfy a statutory requirement which Congress has imposed as a prerequisite to the acquisition of citizenship by naturalization, we must agree with the Government that petitioner's citizenship must be revoked because it was "illegally procured." See *Polites v. United States*, 364 U.S. 426, 436–437 [81 S.Ct. 202, 208, 5 L.Ed.2d 173] (1960); *Schwinn v. United States*, 311 U.S. 616 [61 S.Ct. 70, 85 L.Ed. 390] (1940); *Maney v. United States*, 278 U.S. [17,] at 22–23 [49 S.Ct. 15, 16, 73 L.Ed. 156;] *United States v. Ginsberg*, 243 U.S. [472,] at 475 [37 S.Ct. 422, 425, 61 L.Ed. 853;] *Luria v. United States*, 231 U.S. 9, 17 [34 S.Ct. 10, 11, 58 L.Ed. 101] (1913); *Johannessen v. United States*, 225 U.S. 227, 240 [32 S.Ct. 613, 616, 56 L.Ed. 1066] (1912). Cf. *Schneiderman v. United States*, 320 U.S. at 163 [63 S.Ct. at 1355] (Douglas, J., concurring). In the lexicon of our cases, one of the "jurisdictional facts upon which the grant [of citizenship] is predicated," *Johannessen v. United States, supra,* 225 U.S. at 240, 32 S.Ct. at 616, was missing at the time petitioner became a citizen.

—— U.S. ——, 101 S.Ct. 751 (footnote omitted). *See* H.R.Rep.No. 1086, 87th Cong., 1st Sess., 39 (1961) (Citizenship is illegally procured if "some statutory requirement which is a condition precedent to naturalization is absent at the time the petition [for naturalization is] granted."). *See also* —— U.S. ——–——, 101 S.Ct. 747–748.

(B) *Misrepresentation of a Material Fact Under § 10 of the DPA*

The Government's second argument under its contention of illegal admission under the DPA is that, when Osidach obtained his immigration visa in 1949 as a displaced person, he willfully misrepresented a material fact in order to secure his entry into this country in violation of § 10 of the DPA, which provides in pertinent part:

Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States . . . .

62 Stat. 1013 (1948).

In *Fedorenko*, the factual record before the Supreme Court indicated that defendant Fedorenko had misrepresented his wartime service as a concentration camp guard both to the DPC and to the reviewing viceconsul. He admitted both misrepresentations during his trial testimony. —— U.S. ——–——, 101 S.Ct. 743–745. The misrepresentation came about when Fedorenko gave a sworn statement, which he signed, containing false representations about matters specifically asked of him about his wartime activities.

■ In the present case, the factual circumstances are not as clear. The evidence does not show that Osidach was ever specifically asked, either in his written application to the DPC or orally by the DPC reviewing officer or the reviewing vice-consul, about his war-time activities or even his employment for the period 1941 to 1944 [*see* Ex. P–20, 21]. A "misrepresentation" of a material fact cannot occur when an applicant is not asked either orally or in writing about the information he is claimed to have

misrepresented. There is no duty to disclose information which was not requested. *See supra* at 68–69. The Court finds that Osidach did misrepresent a material fact by his submission to the DPC of a fraudulent document for purposes of securing admission to this country as a displaced person.

It is undisputed that, when Osidach initially applied to the IRO in 1948 for certification as a displaced person, he provided them with certain information which became contained in his IRO Resettlement Registration Form [Ex. P–17]. This document was signed by Osidach [N.T. 3–55; dep. 1 at 11]. Item 13 on that form dated May 23, 1949, pertaining to "Employment for last 12 years beginning with present" shows that from "1936–1944" Osidach was employed as a "dairy technic" for the "Dairy Association" of "Rawa Ruska and Tomaszow, Poland." In clear contradiction of this important representation, Osidach admitted both at trial and in his pretrial deposition that he was last employed as a dairy technic for a few weeks in 1941, and that from 1942 until 1944 he served as a full-time Ukrainian policeman in the town of Rawa Ruska [N.T. 3–58; dep. 2 at 92–95; *see* Ex. P–17]. Osidach ultimately conceded that the information contained in Ex. P–17 regarding his employment from 1941 to 1945 was not the truth [N.T. 3–57 to 58; dep. 2 at 92–95]. Osidach also stated that he knew that the IRO was interested in knowing whether people had served as police during WW II and that the disclosure of that information might result in his failure to immigrate to the United States as a displaced person [dep. 2 at 93, 94].

As the Supreme Court in *Fedorenko* very clearly stated:

That petitioner gave these false statements because he was motivated by fear of repatriation to the Soviet Union indicates that he understood that disclosing the truth would have affected his chances of being admitted to the United States

and confirms that his misrepresentation was willful.

—— U.S. —— n.26, 101 S.Ct. 748 n.26. *See also Fedorenko, supra,* 597 F.2d at 953.

▮▮▮▮ Therefore, this Court finds that Osidach willfully misrepresented his war-time service as a Ukrainian policeman for the purpose of securing admission to the United States. Section 10 also requires, however, that the willful misrepresentation be for "purposes of gaining admission into the United States as an eligible displaced person." That language requires that the willful misrepresentation be made before the DPC because it was that agency, and that agency alone, that had the power in 1949 to grant eligibility as a displaced person under the DPA. The IRO was a preliminary international agency which itself granted eligibility certification for displaced persons, but there is no basis to conclude that the DPC was automatically bound by a preliminary IRO certification. While the DPC "relied upon" IRO findings, it was free to make its own determination under the DPA standards of eligibility [N.T. 13–21; *but see* Segat dep. at 21].

The Court finds that the willful misrepresentation of a material fact to the DPC turns up here in Osidach's IRO Resettlement Form [Ex. P–17], submitted to the DPC in 1949. That form contained the admitted false representation concerning Osidach's war-time activities and was the type of document routinely given to support an application for displaced person status and relied upon by the DPC in determining eligibility as a displaced person [N.T. 7–62 to 63].

There was a misrepresentation to the DPC here, even though the present record does not show whether Osidach personally submitted Ex. P–17 to the DPC directly. This is so because under the standard procedure Ex. P–17 was a document routinely submitted, by whatever means, and relied upon by the DPC in determining eligibility.[29] This, coupled with Osidach's admis-

29. That the DPC routinely relied upon the IRO Resettlement Form information helps to explain why the DPC did not separately ask ap-

plicants about war-time employment, since that information was provided by the applicant in the space provided on the IRO Resettlement

sion that he provided false information on Ex. P–17 in order to enter this country [N.T. 3–55; dep. 2 at 93–94] requires this Court to find that Osidach knew that his IRO Resettlement Form containing purposeful false representations was the type of document that would be relied upon by the DPC in determining his eligibility as a displaced person in order to allow him to enter this country; and that the submission of that form to the DPC constituted a willful misrepresentation of fact under § 10 of the DPA. That Congress clearly intended that § 10 of the DPA cover the submission of false and fraudulent documents is manifestly clear from the legislative history of the DPA. *See infra* at 107, 109 n.35.

 Osidach's misrepresentation of a material fact before the DPC for purposes of securing entry into this country is no less willful because of fear of Soviet repatriation [dep. 2 at 92–95]. While this motive may, without more, be bottomed on a genuine personal concern, it may not at the same time serve to excuse Osidach from being bound, as all other displaced persons were, by the limits of status eligibility which were expected to be applied in virtual sole re-

liance on truthful disclosures by applicants in the documents and interviews. A disqualifying factor for entry into the United States under the DPA standards cannot change its character because it may have been willfully misrepresented for reasons that might have been justified on grounds unrelated to entry into the United States. Congress intended that the DPA was to serve to further the fundamental spirit that has always existed in our country of providing a safe harbor for those individuals who have been subject to or fear persecution for their political and religious beliefs. That is a threshold principle upon which our country was founded. The DPA, as is clear in § 13, was never intended to be the means of providing a haven in the United States for the persecutors, even though they may fear persecution themselves.[30]

 The Court must find under § 10 that the willful misrepresentation here was of a material fact. The standard of materiality set forth by the Supreme Court in *Fedorenko* is:

It is, of course, clear that the materiality of a false statement in a visa applica-

---

Form, which was regularly and routinely turned over to the DPC.

**30.** The following remarks of Senator Cooper, member of Senate Committee on the Judiciary and Senate Subcommittee to Investigate Immigration and Naturalization, made during the Senate debates on the DPA, are representative examples of the intent of Congress on that issue:

There is a third group. In the closing days of the war there came sweeping back toward Germany, from the Baltic states—from Esthonia, Latvia, and Lithuania—thousands of persons fleeing before the advance of the armies of one of our allies, Russia. I talked to many of those people—Latvians, Lithuanians, and Esthonians. They were people whose countries suffered two occupations. They were occupied by the Russian armies in the early days of the war. Later they were occupied by the German armies, as they moved into Russia. Those with whom I talked stated that the German occupation, bad as it was, did not compare in horror with the Russian occupation; thousands of these people fled from the Russian armies as they moved to join the United States armies in Germany. This group of persons constitutes

a considerable part of the total number of displaced persons.
94 Cong. Rec. 6452 (1948).

Later, at Potsdam, it was agreed that we would accelerate the repatriation of displaced persons to Russia. Russia has continued to insist that her nationals and Baltic nationals should be required to return. I remember that upon one occasion a question arose concerning the spouses of Russians. During their several years' stay in Germany, many Russians had married displaced persons of other nationalities, French, Italian, Belgian, and Dutch, and the Russian representative said to us, "We will take our own people, but we will not take their wives. If they are women, we will not take their husbands. And we will not take their children." I am very happy to say that the problem was solved simply by refusing to send Russians back. Repatriation of such people against their will is not consistent with our traditions or consistent with the statements made so many times by our own Government and even by our Representatives in Congress.
94 Cong.Rec. 6454 (1948). *See also* S.Rep. No. 950, 80th Cong., 2d Sess. 8, 20 (1948) U.S.Code Cong. Service 1948, 2028; H.Rep. No. 1854, 80th Cong., 2d Sess. 15 (1948).

tion must be measured in terms of its effect on the applicant's admissibility into this country. See *United States v. Rossi*, 299 F.2d 650, 652 (CA9 1962). At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa.

—— U.S. ——, 101 S.Ct. 748.

As previously found, Osidach's willing membership in the Ukrainian police and as a participant in its activities in Rawa Ruska from 1942 to 1944 would have under § 13 of the DPA made him ineligible as a displaced person. Therefore, under § 10, the misrepresentation of these facts was material because disclosure would have made him ineligible as a matter of law for an entry visa as a displaced person under the DPA.

▮▮▮ The Court finds that, because Osidach's visa was obtained through a willful misrepresentation of a material fact, it was invalid and his entry into the United States was, therefore, illegal—making his subsequent grant of citizenship in 1963 illegally procured because he had not been a legal resident of the United States for five years prior to his application for citizenship.[31] See 8 U.S.C. §§ 1427(a), 1429. See also *Fedorenko, supra*, —— U.S. ——, 101 S.Ct. 752.

### III. CONCEALMENT OR MISREPRESENTATION OF A MATERIAL FACT IN SECURING CITIZENSHIP

The Government's second major ground for denaturalization is based upon the second prong of § 1451(a), that being that Osidach secured his grant of citizenship in 1963 by the willful concealment or misrepresentation of a material fact. The Government contends that the material facts concealed or misrepresented were Osidach's prior history of arrests, convictions and imprisonments in Poland in the 1930's; his organizational activities with the OUN in the 1930's; and, his employment as a Ukrainian policeman in the town of Rawa Ruska. The Court finds the Government's theory for denaturalization on this ground to be legally and factually without merit.

Under § 1451(a), in order to prove concealment or misrepresentation of a material fact, two separate layers of inquiry must be undertaken: (1) Was there a willful misrepresentation and/or concealment; and, (2) was it of a material fact? See *Fedorenko, supra*, —— U.S. —— n.28, 101 S.Ct. 748 n.28. Applied to the instant case, it must first be shown that there was a concealment and/or misrepresentation as to each of the above categories of factual information. This must have been done by Osidach willfully and before the INS authorities when he applied for citizenship in 1963. Whatever misrepresentations or concealments Osidach might have made after 1963 to INS personnel cannot apply under § 1451(a), because the statute only speaks of concealments or misrepresentations made to obtain citizenship status. Once procured, other laws may come into play (*i.e.*, perjury) but they are not the subject of this case. See *Baumgartner v. United States, supra*, 322 U.S. at 677, 64 S.Ct. at 1246.

In 1963, Osidach misrepresented and/or concealed to the INS his past history of arrests, convictions and imprisonments for political crimes in Poland in the 1930's and his organizational affiliation with the OUN in that same time period. These prior affiliations were clearly proven at trial by the Government. See *supra* at 7. When Osi-

---

**31.** The Court also finds that Osidach illegally procured his citizenship because he lacked the good moral character in 1963 required to secure a valid grant of citizenship because of his past service as a willing member of the Ukrainian police and as a participant in acts of persecution as an interpreter and street policeman. As such, he lacked the good moral character required under 8 U.S.C. § 1427(a), (e). See *United States v. Walus*, 453 F.Supp. 699, 701

(N.D.Ill.1978), *rev'd and remanded on presentation of newly discovered evidence*, 616 F.2d 283 (7th Cir. 1980).

Osidach has also been shown to have lacked the requisite good moral character for a valid grant of citizenship because of his admitted misrepresentation of a material fact to the IRO in 1949 for purposes of securing entry into this country [N.T. 3–55; dep. 2 at 92–95]. See 8 U.S.C. § 1101(f)(6).

dach filed with the INS in 1963 his "Application to File Petition for Naturalization" and "Statement of Facts for Preparation of Petition" [Ex. P–23], he was specifically asked under question 6 of that form:

(6) Have you ever, in the United States or in any other country, broken any public law or ordinance; or been arrested, charged with violation of any law or ordinance, summoned into court as a defendant, convicted, fined, imprisoned, or placed on probation or parole; or forfeited collateral for any act involving a crime, misdemeanor, or breach of any law or ordinance? If "Yes" give the following information for every case.

Osidach responded that he had not, both on the form and at the oral interview with the INS examiner [N.T. 3–85, 86; Ex. P–23]. He was also asked the following question concerning his prior organizational activities:

(7) List each organization, club, or society in the United States or in any other country that you have been a member of at any time, and the dates of membership in each. (If none, write "None.")

In response to that question, Osidach answered on Ex. P–23 and at his interview as to his membership in four separate organizations but did not include among them his prior affiliation with the OUN [N.T. 3–86; 7–102, 103].

At trial, Osidach denied he was ever asked about his prior arrests, imprisonments, convictions or of his membership in organizations other than those situated in the United States [N.T. 3–85 to 88].

However, he does admit signing Ex. P–23 and that he had sworn under oath that the information provided on that form was true and accurate to the best of his knowledge and belief [N.T. 3–88]. Furthermore, at trial, Frank Rumacker ("Rumacker") of the INS, who was the actual examiner who interviewed Osidach in 1963, testified that it was his routine practice when conducting an oral interview of an applicant that, when asking the applicant about each question on the form, to make a check mark next to each answer to indicate that the question

had been reviewed with the applicant [N.T. 7–91 to 93]. Such check marks appear at both question 6 and 7 on Ex. P–23, indicating to the Court that they had in fact been covered and the indicated responses had been provided by Osidach.

Therefore, as to arrests, convictions, imprisonments and organizational affiliations with the OUN, the Court finds that Osidach willfully misrepresented or concealed those facts from the INS authorities in 1963 in order to secure his United States citizenship.

Second, as to the issue of Osidach's employment as a Ukrainian policeman from 1941 to 1944, the only question posed to him on Ex. P–23 was the following question that the Government contends covers those particular employment activities:

(3) What were the names, addresses, and occupations (or types of business) of your employers during the last 5 years? (If none, write "None.")

The question is clearly limited to the five-year period prior to his 1963 application and, as such, would not cover his employment from 1941 to 1944 as a Ukrainian policeman. The Government, in the alternative, contends that question 7 (organization, club or society) listed above was aimed at uncovering Osidach's employment as a Ukrainian policeman. The Court cannot agree.

As Rumacker testified on cross-examination in regard to question 7:

Q And nowhere in this four-page application, this N–400 which is P–23, is there any area, any question asked as to anyone's employment more recent than five years ago; correct?

\* \* \* \* \* \*

A No, as I said, counsel—

\* \* \* \* \* \*

Q All right? There is nowhere in this form, is there, N–400—

A But by inference as I say, Paragraph 7 and 8 as to memberships and societies and—

THE COURT: Let me ask you this: If this person had been a truck driver in 1944, where would that appear?

THE WITNESS: Well, Judge, there was an additional form as part of the supporting documents to the N–400 back in those early sixties. We call it the Foreign Residence and Occupation Card. And they were required to bring those in along with their photographs, their fingerprints, the biographic information, and that was part of the packet.

THE COURT: All right. But on this form, there was no place to put that course of employment as a truck driver, say, in 1942 or a school teacher or whatever?

THE WITNESS: No, we had—it was not on the N–400.

THE COURT: All right.

N.T. 7–127 to 128.

Question 7 is much too ambiguous to possibly be said to cover Osidach's employment from 1941 to 1944—or at any other time. *See Nowak v. United States, supra,* 356 U.S. at 665 n.3, 78 S.Ct. at 958 n.3; *Maisenberg v. United States, supra,* 356 U.S. at 672, 78 S.Ct. at 962; *Fedorenko v. United States, supra,* —— U.S. —— n.3, 101 S.Ct. 761 (Stevens, J., dissenting).

Question 8 on Ex. P–23 does ask about an applicant's prior affiliation with the Communist Party for any period in the past; but no particular question is posed for that same time period, as it could easily have been, regarding an applicant's prior affiliation with other groups, including those that rendered aid and comfort to the enemy during WW II.[32] Interestingly, Ex. P–23 does contain a listing on p.2 of categories of persons deemed ineligible for citizenship, but does not include any reference to persons who were affiliated with organizations assisting the enemy during WW II in the persecution of civilians.

Rumacker testified that, during the time period in which Osidach applied for citizenship, large numbers of persons who immigrated from eastern Europe had applied for citizenship. Rumacker stated that it was his personal policy at that time to ask adult males from that geographic area when interviewed about their activities during WW II in conjunction with question 7 [N.T. 7–98]. *See also* Iwanna Osidach dep. at 37–38.

■ However, there is no clear evidence on the present record that Osidach was personally asked that question by Rumacker during his 1963 interview, or even that the question was routinely asked of all applicants as a matter of INS official policy which might have been shown through documentary or testimonial proof. As noted, Rumacker testified that during interviews with applicants he made a red check mark next to each question covered with the applicant. These marks appear in several places throughout Osidach's application form. Furthermore, Rumacker stated that when he made corrections of any items on the form he numbered each one and made a notation at the end of the form as to those corrections made. Such notations appear on Osidach's form. However, the form contains no mark or notation, which Rumacker would have made if the interview warranted it, indicating that any question was asked concerning Osidach's war-time service.[33] On this record, the Court finds that

**32.** In *United States v. Walus, supra,* the court held that the defendant there had concealed or misrepresented his war-time service as a member of the German S.S. when he applied for citizenship in 1970. However, the form of question at that time was far different than what appeared in Osidach's citizenship application in 1963. In 1970, the INS form contained the following question:

In Question 7, the applicant is required to "(*I*)ist (his) present and past membership in every organization, association, fund, foundation, party, club, society, or similar group in the United States *and in any other place and (his) foreign military service.*"
453 F.Supp. at 704 (emphasis supplied).

In response to that question, defendant Walus failed to indicate his membership in the Gestapo. The court, therefore, held that his answer was a knowing misrepresentation or concealment of a material fact under § 1451(a). The facts of the present case are significantly different and, therefore, the Court finds the *Walus* case inapplicable.

**33.** At trial, it was indicated that Osidach's visa file ("A" file) containing "supporting docu-

the Government has failed to meet its burden of proof of showing that Osidach willfully misrepresented or concealed his employment as a Ukrainian policeman during WW II to the INS in 1963 under § 1451(a).

■ As to those facts which the Court does find that Osidach willfully misrepresented to or concealed from the INS (arrests, convictions, imprisonments, OUN membership), a further inquiry must be undertaken under § 1451(a)—that being whether the facts so misrepresented or concealed were material facts. The seminal decision on that issue defining materiality under § 1451(a) is *Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1966). The *Chaunt* opinion sets forth two alternative tests, either of which must be met in order to prove materiality under § 1451(a):

> We only conclude that, in the circumstances of this case, the Government has failed to show by "clear, unequivocal, and convincing" evidence either (1) *that facts were suppressed which, if known, would have warranted denial of citizenship* or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

364 U.S. at 355, 81 S.Ct. at 150 (emphasis supplied).

The proper legal construction to be afforded the second prong of the *Chaunt* test has been vigorously litigated in the courts resulting in a split among the circuits and spawning substantial commentary. *See generally* I. Appleman, Misrepresentation in Immigration Law: Materiality, 22 *Fed. Bar.J.* 267 (1962); Note, Misrepresentation and Materiality in Immigration Law—Scouring the Melting Pot, 48 *Fordham L.Rev.* 471 (1980); Note, Concealment of

Fact Forestalling an Investigation in Denaturalization Proceedings, 47 *U. of Chicago L.Rev.* 588 (1980).

The recent *Fedorenko* decision of the Supreme Court failed to directly resolve this controversy. *See* —— U.S. ——–——, 101 S.Ct. 744–747. *But see* —— U.S. ——, 101 S.Ct. 753 (Blackmun, J., concurring); —— U.S. ——, 101 S.Ct. 758 (White, J., dissenting).

Fortunately, we need not enter the continuing legal foray at this time because the Government has based its argument of materiality under § 1451(a) solely upon the first prong of the *Chaunt* test, which requires that Osidach must have suppressed facts "which, if known, would have warranted denial of citizenship." *Chaunt, supra,* 364 U.S. at 355, 81 S.Ct. at 150.

Applying that test here, the Court finds that the facts concerning Osidach's arrests, convictions and imprisonments and his OUN membership misrepresented to or concealed from the INS by him in 1963 were not material under *Chaunt.* In so finding, the Court primarily relies on the testimony of Rumacker, who testified:

Q And if it was included in the application it wouldn't have reflected unfavorably upon the application, would it?

A No. It depends. It depends on what the arrest was and what the charge and what the disposition, the nature of the offense.

Q Well, let's assume the arrest was for political activities in Poland in the period between 1930 and 1939 and that there would be records that would reflect that that arrest was for distributing handbills advocating a free Ukraine?

A Yes.

Q Would you deny that petition on that basis?

ments for the visa" was utilized by the INS in 1963 in granting Osidach citizenship [N.T. 7–87 to 89, 124, 127, 128; 3–54]. However, there was no testimony elicited from Rumacker or any other witness from the INS that included among those supporting documents was Osidach's IRO Resettlement Registration Form [Ex. P–17], which contained the false representations discussed before. There was also no

evidence that Osidach knew or should have known that Ex. P–17 was contained within those supporting papers. As such, the factual association is far too attenuated for the Court to find a misrepresentation or concealment of a material fact through the submission of a false document as this Court has heretofore found in regard to § 10 of the DPA.

A No, not—I wasn't aware of that arrest and if it had been disclosed I'd feel that that was fairly innocuous.

N.T. 7–123. *See also Fedorenko v. United States, supra,* —— U.S. —— n.15, 101 S.Ct. 757 n.15; *Chaunt v. United States, supra,* 364 U.S. at 353–355, 81 S.Ct. at 149–150. *See also Calvillo v. Robinson,* 271 F.2d 249 (7th Cir. 1959).

Finally, as to the materiality of Osidach's prior organizational affiliation with the OUN, Rumacker testified on cross-examination that he was not even familiar with that organization [N.T. 7–119]. Furthermore, there is no evidence that the OUN, as an organization, ever had as its purpose or did it in fact ever render aid and comfort to the enemy during WW II. Whatever evidence does exist on the present record is entirely to the contrary. Dr. Mirchuk testified for Osidach that he personally was persecuted by the Germans precisely because of his OUN membership and activities [N.T. 10–10, 11, 28, 29, 30, 35, 36, 46].

The same rationale articulated by Rumacker, rendering immaterial Osidach's prior arrests, convictions and imprisonments for political activities as a member of the OUN, is equally applicable in regard to mere membership in that same organization.

The Court finds that Osidach's prior arrests, convictions, imprisonments and OUN membership, if known by the INS in 1963, would not have warranted denial of his citizenship and, as a matter of law, fail to satisfy the test of materiality under § 1451(a) laid down in *Chaunt.*[34]

The Court concludes that the Government has failed to satisfy its burden of proof under the first prong of § 1451(a) and, accordingly, denaturalization is not warranted on that ground.

## IV. CONCLUSION

In conclusion, for all the reasons set forth above, the Court finds that the August 7, 1963, order of the United States District Court for the Eastern District of Pennsylvania admitting Wolodymir Osidach to citizenship of the United States of America shall be revoked and set aside and his certificate of naturalization (number 8633492) issued pursuant to that order be canceled, on the ground that such order and certificate of naturalization were illegally procured by Osidach under 8 U.S.C. § 1451(a). Accordingly, in this denaturalization action, judgment will be entered in favor of plaintiff United States of America and against defendant Wolodymir Osidach.

An appropriate Order will be entered.

## APPENDIX

*Legislative History of Section 13 of the Displaced Persons Act of 1948*

Aside from the plain meaning to be accorded to the wording of the statute, the Court believes that great weight should be placed upon the legislative history of § 13 in order to determine the types of "movements" and their activities and "members or participants" which Congress specifically intended to be precluded from acquiring benefits under the DPA.

Examining the congressional committee reports first for chronological clarity, the Senate and House committee reports each focus in different respects and degrees, as will be shown, on two major problems about which § 13 was ultimately designed to alleviate.

Section 13 was initially excluded from the proposed Senate version of the DPA as set forth and discussed in Senate Report 950 of the Senate Committee on the Judiciary, S.Rep.No.950, 8th Cong., 2d Sess. 50 (1948), reprinted in [1948] U.S.Code Cong.Serv. 2028. That report, issued March 2, 1948, was formulated after a specially created subcommittee had undertaken a first-hand investigation of the displaced persons problem in Europe in 1947 and 1948. The proposed bill was intended to remedy the prob-

---

**34.** The Court incorporates by reference those arguments and authorities raised by the Government in its memoranda of law in support of its motion for summary judgment as to Osidach's affirmative defenses. *See also Walus, supra* at 716.

lems revealed by that investigation. While the report does quote from the IRO constitutional provision at issue here, the only reference made to that provision is that it specifically excluded persons of German ethnic origin, the so-called Volksdeutsche, Report at 8–10. The report does speak at great length about the activities of Communist Party members in displaced persons camps, which the investigation found not to be as great a problem as previously thought, Report at 20. However, the committee noted that it was possible under the present IRO system for communists to infiltrate displaced persons camps and submit false documents for certification purposes because there were problems in verifying data and checking proof of nationality. In fact, two communists who had submitted false documents had been caught, Report at 20. The officials who were interviewed stressed the need for greater investigation, Report at 27. One consular official testified that 40% of the displaced persons were using "fraudulent documents," Report at 27. In an apparent attempt to alleviate the above-stated problems, the Senate Committee's proposed bill included § 6, which was subsequently incorporated into the DPA as § 10.

Finally, the report stated that the specific purpose of § 10 was to stop communist infiltration into the United States through increased investigation and by putting the burden of proof on the applicant to secure displaced person status, Report at 57.

On May 4, 1948, the House Committee on the Judiciary issued Report 1854 on the Emergency Displaced Persons Admission Act, H.R.Rep.No. 1854, 80th Cong., 2d Sess. (1948). That report indicated that the House took a somewhat more alarming view of the degree and scope of the displaced person problem than had the earlier Senate report. The House report notes that although the Senate report had observed that the communist problem in the displaced persons camps was not overt and manifest, "It is nevertheless a matter of record that a few Communists may have been 'planted' among the displaced persons and that it will take careful additional

screening by U. S. Army authorities and consular officers to prevent those 'plants' from reaching the western democratic countries." Report at 14–15. As to the scope of the displaced persons problem, the House report very clearly stated that it was not merely restricted to a problem of communist infiltration but included a concern over other subversive organizations and persons as well. As the committee stated:

The committee wishes to emphasize at this point that several specific provisions of H.R. 6369 are designed to enable consular officers abroad and immigration authorities in this country to prevent from entering the United States any and all undesirable elements, such as persons with bad moral records, persons afflicted with diseases making them inadmissible, or persons whose presence in this country may endanger its public safety—Communists and members *or former members of movements or groups which during the war rendered aid and comfort to the enemies of the United States.* It is the consensus of the committee that in the administration of the act those safety measures should be strictly adhered to and meticulously enforced.

Report at 15 (emphasis supplied).

In an apparent attempt to alleviate both problems simultaneously, the House version of the bill, H. 6396, contained a provision marked § 2(c), which was subsequently incorporated in substantial part as § 13 of the DPA. Section 2(c) provided:

I refer again to the bill. Under subsection (c) of section 2, I read:

The term "displaced person" shall not include *any person who is or has been a member of, or participated in, any movement* which is or has been hostile to the United States or the form of government of the United States.

94 Cong.Rec. 7878 (1948) (emphasis supplied).

Following the submission of the Senate and House reports with their respective proposed versions of the DPA, extensive legislative debate ensued on each floor of

Congress, during which time further amplification was provided on the concerns expressed in the committee reports. The merits of the Senate and House bills were also vigorously debated. From the debates, we can see that Congress was very definitely concerned about excluding certain categories of persons as eligible displaced persons under the DPA. These categories of persons can be basically broken down into three major areas of concern.[35] First, Congress was concerned about the threat of communism both within and outside this country. It was distressed about the possibility of communist infiltrators securing displaced persons status.[36] Second, Congress was concerned about the continued exclusion of those types of persons who were then already excludable under the existing immigration laws in force in 1948. *See* S.Rep.No.950, 80th Cong., 2d Sess. 31 (1948) [U.S.Code Cong. Service 1948, 2028]. This concern was later codified in the DPA

under § 2(c)(2) which provides that, in order to be a displaced person, among other qualifications the person must be "qualified under the immigration laws of the United States for admission into the United States for permanent residence...."[37] 62 Stat. 1009. Third, and most important for present purposes, Congress was not only concerned about those persons already excludable or about Communist Party members, but Congress was additionally concerned about members of or participants in "movements" (groups or organizations) which had rendered aid and comfort to the enemies of the United States prior to and during WW II.

It is this latter category of persons that forms the principal thrust of the allegations of the Government against Osidach. The debates that ensued on the floors of the House and the Senate prior to the passage of the Displaced Persons Act provide very

**35.** A fourth area of concern, which subsumed the other three areas involved the general problem of the submission of fraudulent information either orally during interviews or by the submission of false documents for purposes of securing displaced persons status. This overriding concern manifested itself through the enactment of § 10 of the DPA. *See* 94 Cong. Rec. 6446, 6447 (1948) (remarks of Senator Wiley). *See also* S.Rep. 950 at 20. This provision was aimed at dealing with misrepresentations of material facts by any applicant under the Act, including members or participants in communist or non-communist subversive movements. *See infra* at 108.

**36.** The following remark exemplifies the concern about communist infiltration that distressed some legislators:

I believe that one of the principal factors contributing to the growth of tyranny, paternalism, and socialism in the United States has been the character of our immigration during the past 40 years. Let us not increase the power of those forces already making a dangerous onslaught against the foundations of American institutions. Let us not admit even 200,000 as an opening wedge. The conquest of America by communism which Stalin recently predicted would occur within 5 years. It can be facilitated in no better way than by the lowering of our immigration barriers.

Mr. President, this is a time of world tension and climactic struggle, when we should labor unceasingly to make America strong.

While we are laboring to deport and expel Communists in our midst, let us not relax our immigration restrictions and admit many more of Stalin's agents into this country. Should a third world war occur, I feel that this Nation would be faced with sabotage of its industrial resources by Red agents already in our midst, who have come into the country in the past few years. The argument is made that if we pass this bill, they will be screened. I submit that the intelligence officers of the American Army will verify the statement that no effective method of screening has ever been devised, and that there is absolutely no way to protect this country from that danger except by keeping such people out of the United States.

94 Cong.Rec. 6904 (1948) (remarks of Senator Eastland). *See also* 94 Cong.Rec. 6180 (1948) (remarks of Senator Revercomb); 94 Cong.Rec. 6447 (1948) (remarks of Senator Wiley); 94 Cong.Rec. 6864 (1948) (remarks of Senators Russell and Revercomb).

**37.** *See* 94 Cong.Rec. 6403 (1948) (remarks of Senator Smith): "It is fundamental that persons who are likely to become public charges, persons convicted of crimes involving moral turpitude, the insane and feeble-minded, and persons afflicted with contagious diseases should not be admitted into the United States, whether or not they are displaced persons. That test is in our immigration laws. That test should be applied to all these people."

helpful insight as to the exact types of movements and persons, and the extent and degree of their activities, about which Congress was discontented, which ultimately prompted the inclusion and passage of § 13 of the DPA.

The debates focused primarily on one particular group of individuals that certain members of Congress were desirous of excluding from the list of eligible displaced persons. Those persons were the so-called Volksdeutsche, or those persons of German ethnic origin who were born in countries other than Germany. Under the IRO Constitution, those persons were specifically excluded from eligibility as displaced persons within the scope of concern to the IRO. *See* IRO Constitution, Annex I, Part II, item 4, 62 Stat. 3051–3052, attached as Ex. B to the Plaintiff's Pretrial Memorandum. *See also* S.Rep.No.950, 80th Cong., 2d Sess. 8–10 (1948) (commenting on that provision as it relates to the Volksdeutsche).

As the debates and reports indicate, many legislators did not think that the broad-brush approach that had been applied by the IRO to the Volksdeutsche was justified in all cases. Therefore, a compromise was reached between the different legislative factions allowing for a limited number of Volksdeutsche to be allowed entry as displaced persons. *See* § 12 of the DPA, 62 Stat. 1013–1014. However, as an appeasement to prevent those Volksdeutsche who had in fact been members of or participated in movements that had indeed rendered aid and comfort to the enemy either prior to or during the war, § 13 was enacted as an additional protection provision, along with the other screening and burden of proof provisions of the Act. *See* § 10, 62 Stat. 1013.

It is recalled that § 13 was not merely intended to remedy the problem of communist infiltration, or the problem of collaborating Volksdeutsche during WW II, but was also designed to cover any other group or organization which had similarly rendered aid and comfort to the enemy during the war. Collaborating Volksdeutsche merely served as one example of the type of movement with which the congressional mood of exclusion was concerned. One further point that is revealed from the legislative debates is that the groups or organizations intended to be covered under § 13 were not to be categorized in broad ethnic terms. Therefore, being a member of the Volksdeutsche in and of itself was not enough to be excludable under § 13, because § 12 provided for a limited quota entry for Volksdeutsche members. Rather, it was necessary to be a member or participant in a group or organization which happened to be composed of members of the Volksdeutsche *and* was a movement rendering aid and comfort to the enemy. In a similar vein, merely being a Ukrainian would be insufficient to establish a responsibility for improper war-time activities of any Ukrainian-composed movements during WW II. Geographic boundaries were also thought of by Congress as a basis for the exclusion of movements operating in particular countries or regions. Therefore, Congress intended to limit, to a degree, the ethnic and geographic scope of the provision. Exactly where these lines were intended to be drawn is discussed at *supra* 74–75.

The legislative debates substantiate the Court's interpretation of § 13. The following exchange among Representatives Jenkins, Kernsten, Celler and Fellows, the latter two being members of the House Committee on the Judiciary—the latter was also the representative submitting House Report No. 1854 in 1948—is very beneficial in understanding the competing concerns of Congress as to the activities allegedly committed by the Volksdeutsche including, in particular, the persecution of innocent civilians:

> Mr. KERSTEN of Wisconsin. Is it not true that it would be better to consider them as a whole rather than one-tenth of them and discriminate against all of those who have a German ethnic background?
>
> Mr. FELLOWS. Against what countries are you going to charge the quota?
>
> Mr. KERSTEN of Wisconsin. This is not a question of quota.

Mr. FELLOWS. It is; because you are going to charge it against the land of their birth, not Germany.

Mr. KERSTEN of Wisconsin. Why do we base the bill on racial discrimination?

Mr. FELLOWS. We do not.

Mr. KERSTEN of Wisconsin. Why do we have this discriminatory definition in it?

Mr. FELLOWS. We have adopted the IRO constitutional definition, the IRO definition of "displaced persons." We do that for the reason it solves the question we are trying to solve. These people are fine people, but they are in the economy of Germany.

Mr. KERSTEN of Wisconsin. That is right. It solves it by discriminating against everyone of German ethnic background.

\* \* \* \* \* \*

Mr. JENKINS of Pennsylvania. Is it not a fact that the people who would be covered by this amendment are the so-called Sudetan Germans?

Mr. FELLOWS. Yes.

Mr. JENKINS of Pennsylvania. Their exclusion from the definition under IRO was because of the fact they had been considered quislings of the Nazis, therefore outside of the IRO set-up?

Mr. FELLOWS. I did not have any part in deciding that. I am not able to answer the question.

Mr. JENKINS of Pennsylvania. Is it not likewise true that they are the same people who were sent into Czechoslovakia by Hitler to *assist in taking* over Czechoslovakia?

Mr. FELLOWS. The gentleman means by that they were *the agents of Hitler* sent in there to help take over Czechoslovakia?

Mr. JENKINS of Pennsylvania. The *people who instigated the disorder* in Czechoslovakia which furnished the excuse for Hitler to move in there.

Mr. FELLOWS. If that is true, and I do not know whether it is true, the answer to the gentleman's question a few minutes ago might be different, if they were *people connected with Hitler*, as the gentleman from Pennsylvania implied.

Mr. KERSTEN of Wisconsin. The gentleman knows that *is not true as to the great bulk of these people.*

Mr. FELLOWS. *There is no question about that.*

Mr. KERSTEN of Wisconsin. Furthermore, *subsection (c) line 15 of page 2 would disqualify anybody who was a Nazi.*

Mr. FELLOWS. That is true.

\* \* \* \* \* \*

Mr. CELLER. ... Mr. Chairman, in endeavoring to fashion a definition of displaced persons the American representative to the International Refugee Organization, together with all the other representatives, came to the inevitable conclusion that the Volksdeutsche, which is the subject of the pending amendment, could not be deemed displaced persons. See the definition of displaced persons in the constitution of IRO—Appendix 1, annex 1, paragraph 1, pages 66–67–68, of the Displaced Persons Report issued by the Senate March 2, 1948. Why were they not the concern of the International Refugee Organization? *Because they were the spearheads of the German civilian advance into the countries Hitler overran.* They were the ones who were sent forward to fertilize the ground for Hitler's coming. *They became the gauleiters and quislings in Norway and Holland and Poland and Russia and Czechoslovakia. They were the ones that were in the advance of Hitler's armies and made possible, through their fifth-column activities, the victories of Hitler.*

\* \* \* \* \* \*

Mr. JENKINS of Pennsylvania. Inasmuch as the gentleman from Mississippi has completely misunderstood the attitude of the gentleman from Pennsylvania I would just like to interject at this point that my own feeling with respect to the inclusion of Communists in this bill is as anti-pathetical as his own, but that I likewise object to the inclusion of those who

were the *followers of Hitler as the bene-ficiaries of this bill.*

Mr. CELLER. And these are the people who are the subject of this amendment and who were, in the main, the advance agents of Hitler.

Mr. KERSTEN of Wisconsin. Mr. Chairman, will the gentleman yield?

Mr. CELLER. I will be more gracious than the gentleman from Wisconsin. He refused to yield to me but nonetheless I yield.

Mr. KERSTEN of Wisconsin. Does the gentleman maintain that those people whose ancestors resided in these other countries for three, four, or five centuries were all agents of Hitler?

Mr. CELLER. I would say that the Volkdeutsche, those of German ethnic origin, regardless of ancestry, who were born in Czechoslovakia, Holland, Denmark, and Norway, to a major portion *were adherents of nazism and were the agents of Hitler. Some were, of course, innocent of nazism. Most were not. They became the Nazi aristrocracy and SS Guards. They shared some of the guilt for the bestialities and the sadism that was encouraged by Hitler in Czecho-slovakia, in Norway, and in the various countries that were finally overrun by the Nazis.* Certainly, we cannot extend an invitation to that kind of people to come into this land. *I do not want the Communists to come in, and with equal force I say I do not want the Nazis or Nazi followers to come in.* These Volkdeutsche are Latvians, Poles, Czechs, and Russians of German origin who before the war enjoyed the same rights as their compatriots of Czech descent, or the Poles of Polish descent, and so forth. When the Nazi machine went into high gear most of these Volkdeutsche jettisoned the countries in which they lived and became the spearhead of the Nazi *fifth column* which succeeded in dismembering Czecho-slovakia, *facilitated* the Reichswehr blitz of Poland, and seriously handicapped the Russian war effort in the Volga region. *These Volkdeutsche outdid the Germans in persecuting the conquered people.*

*They were infuriated with the job of herding Nazi victims in sealed-door trains and taking charge of crematoria. Those are the men and women you are trying to help by this amendment.*

Read the hearings of the war criminals' trials at Nuremberg; read the Army war records, and you get a feeling of revolt against these Volkdeutsche. Most of them, judging from these records, are guilty of crimes against humanity.

94 Cong.Rec. 7872–7873 (1948) (emphasis supplied). *See also* 94 Cong.Rec. 6894 (1948) ("I do not speak to the character of these people as individuals, but we must remember that one of the causes of the war was the problems created by these groups of Germanic origin.... Whether all of them were willingly parties to circumstances which accelerated the way, I do not say; but some of them were parties and they were one of the causes of the beginning of the war....I say they were members of groups which to some degree helped bring about the war....") (remarks of Senator Cooper, member of the Senate Subcommittee to Investigate Immigration and Naturalization and the Senate Committee on the Judiciary); 94 Cong.Rec. 9019–9020 (1948) (remarks of Senator Pepper); 94 Cong.Rec. 7876 (1948) (remarks of Rep. Javits, member of the Special Subcommittee of the Committee on Foreign Affairs, which investigated the problem of displaced persons in Europe) ("[M]any ethnic Germans in the countries the Hitler hordes overran, were often members of the celebrated fifth column who actively supported the Nazi program."). *See also* N.T. 3–48, 49 (Volksdeutsche in Rawa Ruska used as interpreters for Germans).

Second, as stated, § 13 was not only intended to speak to those members or participants in Volksdeutsche-composed movements which rendered aid and comfort to the enemy, but also to those members or participants in *other* movements who had committed the same types of acts as some Volksdeutsche, including assisting the Germans in the persecution of innocent civilians.

During the House debates, reference was made to § 2(c) of House Bill 6396, subsequently incorporated in significant part as § 13 of the DPA. During the debates, it was stated that § 2(c) went beyond the then-existing immigration limitations for entry into the United States. In that regard, the following remarks of Representative Fellows are exemplary:

> ... The bill does not waive any of the safeguards against subversives, immoral types, sick persons, and so forth, provided for in the immigration laws but this legislation adds additional safeguards such as subsection (c) of section 2 and the language contained in lines 12 to 15 on page 7. It also provides for special penalties in section 10 which we do not have in our existing immigration laws. Moreover, within the last few days, the President signed a law passed by this Congress— Gossett bill—which grants the Attorney General additional powers for exclusion of persons who might engage in subversive activities detrimental to the United States. *In other words, whatever safeguards we have in our existing immigration laws are being supplemented by additional safeguards contained in H.R. 6396.*
>
> \* \* \* \* \* \*
>
> Fourth. Opponents suggest undesirables may get in. Careful screening is provided for to eliminate possibility that those with bad moral records, those afflicted with disease or those who might endanger our public safety may be kept out. *Specific provisions bar Communists and members of movements which during the war rendered aid and comfort to our enemies.*

94 Cong.Rec. 7740 (1948) (emphasis supplied). *See also* 94 Cong.Rec. 7774 (1948) (remarks of Rep. Dorn).

Third, Congress' concern about the activities of certain movements focused upon activities committed in particular geographic areas, including of note the geographic ar-

eas in issue in *this* litigation. The following remarks of Senator Eastland, a member of the Joint Conference Committee and the Senate Committee on the Judiciary, and Senator Revercomb, who was the chairman of the Senate Subcommittee to Investigate Immigration and Naturalization and who was also a member of both the Senate Committee on the Judiciary and the Joint Conference Committee issuing S.2242 which, with minor changes eventually became the DPA, are useful: [38]

> Mr. EASTLAND. The Senator knows, of course, that *thousands of displaced persons have voluntarily left Russia and Russian-occupied territory. It has been the policy of the Russian Government to see that they did.* I should like to call the Senator's attention to a news article published in the New York Times on February 1 of this year, stating that the British had diverted 15,000 displaced persons to Cypress, where they were thoroughly screened. Of that 15,000, 1,000 were found to be agents of the regime in power in Russia, *or to have voluntarily joined subversive organizations.* There have been admitted to displaced persons camps since the close of the war thousands of persons in that category. There has been no screening of them. We have no system of screening, no system *for the detection of agents and others belonging to subversive organizations.* Does the Senator not think that if the pending amendment should be adopted there would be admitted into this country thousands of people who would come under the category of those screened by the British at Cypress, of whom 1,000 out of 15,000 were ascertained to *be Communist agents or members of subversive organizations?* I may say to the Senator, the statement appeared in the newspapers and was denied, yet later it was confirmed officially by the British Government.
>
> Mr. REVERCOMB. I would, of course, say to the Senator I cannot tell how

---

**38.** Note that the above comments were made *prior* to the adoption by the Senate of the language contained in § 2(c) of H.6396, later § 13 of the DPA. The Senate bill version at that point in time did not contain the § 2(c) language.

many would come; no man can tell. But I feel that if the time were extended there would be a greater likelihood of the admission of a large number of those tainted with communistic ideas and doctrines, and undoubtedly some of the Communist agents. The bill provides a method of screening them, and preventing the entry into this country of persons who are today working to tear down this Government. We are now confronting that problem in a committee with respect to drafting legislation that will stop the activities of those representing a foreign government in this country, whose activities are directed toward injuring the Government of our own people. That problem is being dealt with. *It has become so acute that legislation has already passed the House of Representatives and is now in a committee of the Senate, designed to outlaw any organization that 'takes its orders from a foreign government, and seeks to injure the Government of this country.* Ah, it is a very live question. It is a very serious one, Mr. President. It is one we must watch, one that we must consider and weigh with great care in dealing with any piece of legislation that becomes our duty to handle in this body.

94 Cong.Rec. 6865 (1948) (emphasis supplied).

Following the above debates in the Senate and the House, a joint conference committee composed of members of both the House and Senate was formed to attempt to work out the differences between the competing versions of the DPA. On June 18, 1948, the Joint Conference Committee issued a report to accompany the revised S.2242, while H.6396 was laid on the table. S.2242, which finally included § 13, was subsequently enacted by Congress with minor amendments irrelevant for present purposes. The Joint Conference Committee report accompanying S.2242 contained the following statement which served to elaborate on the meaning and purpose behind the inclusion of § 13:

The various differences between the measures passed by both Houses pertaining to the administration of the bill were composed so as to insure the proper enforcement of the law, a suitable resettlement of displaced persons all over the United States, its Territories and possessions, and *by preserving all safeguards with respect to exclusion of subversives* and by providing for proper assurances that new immigrants shall not become public charges.

H.R.No. 2410, 80th Cong., 2d Sess. 8 (1948) (emphasis supplied).

Finally, after the submission of the Joint Conference Committee report, the following additional debate ensued on the floors of Congress during which several comments were made that directly bear on the intended meaning of § 13 and its future application. The following remarks were made by Senator Revercomb, a member of the Joint Conference Committee, following debate on the merits of S.2242:

Mr. President, we have covered this subject pretty fully. Some statement was made to the effect that we were going to permit to enter this country persons *who had fought against America, persons who had supported Hitler.* That is probably one of the most mistaken and unwarranted statements made in the debate, and *I wish to read from section 13 of the reported bill,* which rather indicates that Senators who make such a statement have not studied the bill or read it. I know they would not make a misstatement intentionally so misleading and so wrong.

Let me read section 13. Could language be clearer?

No visa shall be issued under the provisions of this act to any person who is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States.

Yet this bill is assailed. Do Senators want a bill to pass which will permit to come into this country men who are hostile to the form of government of the United States? Why would they advo-

cate such a thing? This is the bill they said they wanted passed without that provision in it.

\* \* \* \* \* \*

I do not want to discuss the case any further. Men may differ upon the general idea of immigration and upon its basic ideas. They may well differ. I do not think men can exactly differ upon what is best for their own country. I do not charge that they ignore the rights of their own country. It is simply a matter of opinion as to what is best.

I have heard more speeches made against the bill, coupled with the statement that the speakers are going to vote for it, than I have ever heard in respect to any proposed legislation in this body. I can understand that. The bill is not all I want. *It is a compromise bill.* Much of the legislation that comes out of this body is in the nature of compromise. We are doing the best we can. *The bill was offered to the Senate. The House passed a different bill. We have met in conference and the bill is now presented to the Senate to accept it or to reject it as in the judgment of Senators they feel should be done.*

94 Cong.Rec. 9022–9023 (1948) (emphasis supplied).

Therefore, the conclusion that emerges from this somewhat lengthy but necessary review of the legislative history of the DPA is that § 13 was included within the Act as a compromise provision between the House and the Senate, and it was intended to simultaneously serve a variety of goals dealing with those concerns expressed by different legislators. It represented a compromise between those factions in the House and the Senate who strongly believed that a problem existed as to communist infiltration into this country through the beneficial provisions of the DPA, versus those factions who did not believe the communist problem was as acute and manifest as believed and could be properly handled by § 10 of the DPA without more. The section was also a compromise between those legislators who desired to control the influx of members or participants of groups and organizations, including certain Volksdeutsche-composed groups, who had rendered aid and comfort to the enemy prior to or during the war and, therefore, should not benefit from the special purposes behind the enactment of the DPA, versus those legislators who were opposed to the broadbrush approach of the IRO in dealing with the Volksdeutsche and wanted narrower organizational and geographic lines drawn under § 13 and not those strictly based upon ethnic lines, as was contained in the IRO Constitution. All of these conflicting concerns of Congress in 1948 became codified in § 13, and their review serves to provide a helpful understanding as to the intent of that provision.